Jess **CLIFFORD** et al., Appellants
(Plaintiffs below),

v.

**CITY OF CHEYENNE,** Wyoming, a Municipal Corporation et al., Appellees
(Defendants below).

No. 3939.

Supreme Court of Wyoming.

Aug. 12, 1971.

A. Joseph Williams, Bernard E. Cole, Cheyenne, for appellants.

William A. Riner, City Atty., Cheyenne, for appellees.

Before McINTYRE, C. J., and PARKER, McEWAN, and GRAY, JJ.

Mr. Justice GRAY delivered the opinion of the court.

Plaintiffs on July 6, 1970, commenced an action against the City of Cheyenne and its officers, seeking to enjoin the enactment of an ordinance providing for a partial vacation of a street identified as Omaha Road on the basis that the proposed vacation was without benefit to the city or the public and users of the street and was for the sole and exclusive benefit of the owners and operators of the K-Mart store. In disposing of the litigation the trial court in its memorandum opinion determined that the vacation was for a public purpose and the determination by the city council to vacate that portion of the street from the point where it intersects with Holmes Street to the west curb line of Grove Drive,[1] requiring an additional driving distance of approximately 150 feet, was not fraudulent, collusive, arbitrary, or an abuse of discretion. Judgment was entered accordingly and plaintiffs appeal. While we do not find that plaintiffs' amended complaint in so many words charged that the proposed vacation would be the result of fraud, collusion, or grave abuse of discretion on the part of the city council, the trial court seems to have so treated it and we proceed on that basis.

By way of some background, the record discloses that Omaha Road many years ago was a part of the old Lincoln Highway which commenced east of Cheyenne at the intersection of Pershing Boulevard and Ridge Road and ran diagonally southwesterly from the intersection to Lincolnway and the downtown area. As a result it formed a "five-legged intersection" at Pershing and Ridge Road, and over the years with the increase in traffic and growth of north and east Cheyenne it began to present a problem. In 1965 Smith and Associates, consulting engineers, were employed by the highway department at the request of the city and county to study and develop a comprehensive plan for the streets and highways in and around Cheyenne. The study was completed in 1968 and a report submitted in 1969. In that report it was

1. For sketch of area involved in the vacation see appendix.

proposed to eliminate the "five-legged intersection" by realigning Omaha Road to intersect with Pershing at a point some 300 feet west of the intersection. In addition, Mr. Vealess F. Hudspeth, a consulting engineer also employed by the highway department, made a study of Pershing Boulevard east from Randall Avenue, the entrance to Warren Air Base, to U. S. Highway 30, some distance east of the Pershing-Omaha-Ridge intersection, and in 1966 submitted a report proposing that Omaha Road be brought into Pershing some 150 to 200 feet west of the intersection. No action was taken on either proposal at that time but by September 1969 the TOPICS program—a federal aid program designed to increase the capacity and safety of streets and highways for the movement of traffic—came into being and Mr. Hudspeth was again employed primarily by the highway department in conjunction with the city and county to make a further study of the entire situation. In October 1969 a preliminary report was made listing some 19 problem areas, one of which was the intersection here in question and which was shown in the TOPICS program as a project proposed for "immediate action." There the matter rested until December 10, 1969, when Mr. Hudspeth obtained the copy of a "plot plan" from Mr. Garrett, a real estate broker, for proposed construction of the K-Mart store. The next day Mr. Hudspeth wrote to Mr. John Whiting, City Engineer, so advising him and stating, "It appears some modifications are needed in the realignment of Omaha Road" and proposing two possibilities, (a) turn Omaha Road into Pershing on Grove Drive, or (b) turn it along Holmes Street to Ridge Road. On January 6, 1970, he submitted to Mr. Dick Uthoff, Transportation Engineer in charge of the TOPICS program, an addendum concerning the intersection to the same effect. Then on June 6, 1970, he submitted a report to the highway department and presumably to the city wherein with respect to realignment of Omaha Road it was said:

"The proposed realinement of Omaha Road starts near Pine Drive and connects to Holmes Street on an approximately 600-foot radius. Grove Drive will be the street connecting the severed segment of Omaha Road. The segment of Omaha Road between Grove Drive and Ridge Road is the area where several alternatives in design could be applied."

In addition to the several proposals to eliminate the "five-legged intersection," which incidentally was not accomplished by the vacation now before us, Mayor Holland testified that when he learned of the possibility of the K-Mart store locating in the area he was concerned about the problem of drainage which would result from the construction of a large building and surfacing of extensive parking facilities. Commissioner Gysel also testified that drainage was a problem in the area even in its raw state and the big problem presented by realigning Omaha Road was whether to gather the runoff in a retaining pond or "drain it down one of the roads." In any event, sometime in January 1970 a proposal was made—by whom is left undeveloped—whereby, according to Mayor Holland, the problem could be taken care of by the use of a "retaining pond during a downpour so that it could be released at a later time when the rain had subsided and it should be on the same property." Also during "dry weather" the land could be used as a parking area. The terms of a trade were then worked out whereby the K-Mart people, who incidentally were the only abutting owners involved, would acquire title to the vacated portion of Omaha Road and the city in turn would acquire from K-Mart the right-of-way for realignment of Omaha Road from its point of intersection with Pine Drive in a "gradual curve" eastward to Holmes Street and Grove Drive. Other conditions were also imposed which so far as the city was concerned, according to Commissioner Gysel, saved the city some $15,000 to $20,000 on the costs of the realignment. Finally, on June 11, 1970, at a meeting of the city

council and representatives of the purchasers of the property the terms of the trade were agreed upon as reflected by the letter of the city engineer dated the next day, and on June 15, 1970, and June 22, 1970, the ordinance vacating the portion of Omaha Road here considered was passed on first and second readings.

Little more need be added except to say that several of plaintiffs' witnesses testified as to almost daily use of Omaha Road to get back and forth from the downtown area and objected to the inconvenience resulting from the anticipated need to make three turns as a result of the vacation and the likelihood of interference from snow in the wintertime. It was also stipulated that in excess of 750 persons living north and east of the intersection used the street almost daily and would testify along the same lines if called.

■ Much of the time of the trial was also taken up by attempting to establish that the plaintiffs-Clifford suffered some sort of special damage, but here again we think the trial court quite properly put those considerations aside. Other than the inconvenience of using Omaha Road in common with the other users, which was shown to be quite infinitesimal,[2] the Cliffords were not abutting owners, none of their property was taken, their ingress and egress to the property was the same as before the vacation, and the contemplated loss of business coming from the west to their motel and related facilities, even if compensable, was speculative and conjectural. Were it not for the sincerity of plaintiffs' counsel in advancing the public versus private-purpose argument, we would be inclined to affirm the judgment of the trial court denying relief by way of an injunction without further discussion. See 11 McQuillin Municipal Corporations, § 30.200, pp. 154–155 (3 ed. rev.), citing among several other cases Thomas v. Jultak, 68 Wyo.

198, 231 P.2d 974. We shall, nevertheless, add a few comments on that phase of the case.

■ In the first instance counsel, in advancing the argument, seem to overlook the teachings in the Thomas case. We there pointed out that the vacation of streets and highways was a legislative function which could be delegated to cities and towns and, subject only to constitutional limitations, was the grant of plenary and absolute power with which the courts would not interfere except for violation of fundamental rights. Once the city council determines that a street or a part thereof is to be vacated and the manner in which it is to be accomplished, the courts will likewise not interfere unless the determination is brought about by fraud and collusion or is clearly arbitrary and a grave abuse of discretion. The presumption is that the council acted in good faith, and the burden is on those attacking the proceeding to prove the claimed invalidity. In re West Laramie, Wyo., 457 P.2d 498, 501; 64 C.J.S. Municipal Corporations § 1672, p. 50.

■ If, as the complaint alleges, the proposed vacation ordinance was for the *sole* benefit of K-Mart rather than the general welfare, it cannot stand. On the other hand, the mere fact that the abutting owner might receive some benefit will not of itself vitiate the proposed ordinance or furnish grounds to enjoin the vacation, 11 McQuillin, supra, § 30.186(a), p. 123, and that is particularly true if there is evidence from which it can be determined that a public purpose is served, Thomas v. Jultak, supra, 231 P.2d at 981–982; Constantine v. City of Sunnyvale, 91 Cal. App.2d 278, 204 P.2d 922, 925; Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 207 A.2d 522, 535; Capitol Hill Methodist Church of Seattle v. City of Seattle, 52 Wash.2d 359, 324 P.2d 1113, 1119.

---

2. For divergent results on inconvenience see State Highway Commission v. Newton, Wyo., 395 P.2d 606, 612, and State Highway Commission v. Peters, Wyo., 416 P.2d 390, 392. In addition, the trial court in the instant case regarded the testimony as to the contemplated effect of the vacation to be speculative and based on "fears of undeterminable results."

Of course, all courts are not agreed upon what constitutes a public purpose as shown by McQuillin, supra. In addition to Thomas, however, which held that relief from liability and the cost of maintenance was sufficient under the circumstances presented, we rather recently held, in Uhls v. State ex rel. City of Cheyenne, Wyo., 429 P.2d 74, 86–87, that the finding of the trial court to the effect that a public purpose was served by the issuance and sale of revenue bonds to promote the public welfare should not be disturbed.

As a general rule courts do not attempt to lay down any precise definition of the term, and solution to the problem is pretty much left to the circumstances presented in each case. Keeter v. Town of Lake Lure, 264 N.C. 252, 141 S.E.2d 634, 643. In Board of Regents of University and State Colleges v. Frohmiller, 69 Ariz. 50, 208 P.2d 833, 838, it was said:

"  *   *   *  What is 'a public purpose' depends in part upon the ⟨time (age), place, objects to be obtained, modus operandi, economics involved, and countless other attendant circumstances. *   *   *"

Generally speaking, however, it has for its objective the promotion of public health safety, morals, security, prosperity, contentment, and the general welfare of the community. Blumenthal v. City of Cheyenne, 64 Wyo. 75, 186 P.2d 556, 561–562; Platte Valley Public Power and Irrigation Dist. v. Lincoln County, 144 Neb. 584, 14 N.W.2d 202, 205, 155 A.L.R. 412; State ex rel. McClure v. Hagerman, 155 Ohio St. 320, 98 N.E.2d 835, 838.

In considering the circumstances, our general approach is not to isolate certain pieces of evidence as plaintiffs have done for purposes of their argument[3] but to consider the record as a whole in order to determine whether or not there was sufficient evidence favorable to the city from which the trial court could infer that a public purpose would be served. More specifically, it is stated in People ex rel. Sharp v. City of Chicago, 13 Ill.2d 157, 148 N.E.2d 481, 483:

"  *   *   *  If there is any substantial showing in the record that the public interest will be served by vacating or altering a street or alley, the ordinance is within the power of the council, no matter *how much or how little private* parties may be benefited thereby. People ex rel. Weber v. Atkins, 295 Ill. 165, 128 N.E. 913. The court cannot perform the legislative function of determining its desirability; nor can an ordinance be declared invalid merely because, in the court's opinion, the detriments to the public outweigh the benefits. People ex rel. Hill v. Eakin, 383 Ill. 383, 50 N.E.2d 474. The test of validity is whether any consideration of public interest could have led to the enactment of the ordinance. *   *   *"

■ In so doing we are persuaded there was ample evidence to support the judgment. While it is clear that the proposed location of the K-Mart store precipitated the action taken, that alone does not detract from the objectives sought to be achieved by the city. The trial court, in keeping with a proper approach, gave consideration to solution of the drainage problem, the need to eliminate the "five-legged intersection" which had been under study for some time prior to entry of K-Mart into the picture, and the conditions imposed upon K-Mart for accomplishing the realignment.

■ The attack made on the solution of the drainage problem, so far as we can

3. For example, Mayor Holland concluded his somewhat lengthy statement concerning the drainage problem with this sentence: "During dry weather, of course, that property could be used—that area can be used as a parking area, so that was one of the reasons, I am sure, for considering the removal of the road." Counsel seize upon the language "one of the reasons" and advance it as the "sole" reason for the vacation. We are not impressed. At best the language is taken out of context and ignores other reasons which support the trial court.

determine, was that a different solution could have been made without the necessity of the vacation. That may be true, but absent any evidence that the solution of the problem was the result of an illegal purpose we fail to see wherein we could hold the city council was clearly arbitrary in reaching a decision entrusted to its care. It can scarcely be questioned that the drainage problem was solved by the vacation and was for a public purpose.

■ Based upon the premise that the vacation did not actually eliminate the "five-legged intersection," which of course was true inasmuch as the decision had not yet been made to route traffic into Pershing off Grove Drive or into Ridge Road off Holmes Street, it is argued that this could not be done because the advantage to the public must come from the vacation itself and not the use to which the property will be put in the future. People by Webb v. City of San Rafael, 95 Cal.App. 733, 273 P. 138, 141. Assuming that to be the rule, it again is an isolated fact and overlooks other pertinent reasons for the step taken. In the first instance, it is unrealistic to view the proceeding as simply a partial vacation. The trial court might well have found that a primary reason for the proposed change was the realignment of Omaha Road and that could not be accomplished without the vacation as the initial step. It is not questioned that the plans and conditions imposed upon K-Mart for realignment of Omaha Road to the intersection of Grove Drive and Holmes Street were firmed up at the time the ordinance was introduced, and in view of the listing in the TOPICS program showing elimination of the "five-legged intersection" as destined for "immediate action," and assuming, which we must, that the city council acted in good faith, we can hardly hold that the trial court was in error in reaching the same conclusion.

■ Lastly, it is contended that the conditions imposed upon K-Mart by the city and accepted was tantamount to an illegal sale of the vacated portion of the street for the reason that K-Mart was to bear the expenses of a part of the realignment which was estimated to save the city some $15,000 to $20,000. We do not agree. Such fact of itself does not establish the lack of a public purpose. People ex rel. Wagner v. City of Pamona, 88 Cal.App.2d 460, 198 P.2d 959, 960, rehearing denied 200 P.2d 176. True, K-Mart as an incident of the realignment may have acquired some additional parking, but as the trial court pointed out they paid "dearly" for it even though it caused only a slight inconvenience to the public at large.

For the reasons stated we are constrained to hold that the proceedings below were not shown to be erroneous and the judgment must be affirmed.

Affirmed.

APPENDIX