**Julius W. HOBSON, Appellant,**

v.

**·DISTRICT OF COLUMBIA, Appellee.**

**No. 7029.**

District of Columbia Court of Appeals.

Argued April 3, 1973.

Decided May 15, 1973.

David A. Clarke, Washington, D. C., for appellant.

Leo N. Gorman, Asst. Corporation Counsel, with whom C. Francis Murphy, Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee.

Before FICKLING, GALLAGHER and PAIR, Associate Judges.

FICKLING, Associate Judge:

Appellant was convicted after a nonjury trial of failing to pay the established bus fare in violation of District of Columbia Council Regulation No. 72–5.[1]

Appellant raises several issues which he contends require that his conviction be set aside. The only issues we consider substantial enough to warrant discussion are: (1) whether the District of Columbia Council's declaration of an emergency is supported by substantial evidence in the record; and (2) whether the Council complied with its own procedural rules in promulgating Regulation 72–5. After a careful examination of the record, we affirm.

On February 25, 1972, appellant boarded a D.C. Transit bus in front of the District Building and deposited 25 cents in the fare box. After being told by the driver that the fare was 40 cents, appellant responded that "he was only going to put a quarter in the box." A policeman boarded the bus and asked appellant if he knew the fare was 40 cents. Appellant replied, "I paid my fare." The officer then read Regulation 72–5 to appellant and informed him that he could avoid arrest by depositing an additional 15 cents. Appellant replied that this was a "test case" and that he "considered himself to be under arrest." Appellant was arrested, charged by information, and convicted.

■ Appellant contends that Regulation 72–5 is void because the Council's invocation of its emergency procedures was predicated on an invalid determination that an emergency existed. He argues that the Council's conclusion that an emergency existed was not supported by substantial evidence. We do not agree.

On February 23, 1972, this court decided District of Columbia v. Jones, D.C.App., 287 A.2d 816 (1972). In that decision we held that the Washington Metropolitan Area Transit Commission (WMATC) did not have the authority to promulgate a regulation requiring passengers, under threat of criminal sanctions, to pay the WMATC-established fare. That same afternoon, the Washingon Daily News printed a story about the case. The headline of that article was "No Law You Have to Pay Bus Fare."

The following day, February 24, the Chairman of the WMATC, Mr. J. C. Waterman, wrote a letter to Commissioner Washington in which he stated:

The District of Columbia Court of Appeals on February 23, 1972 issued a decision in Case No. 5821, District of Columbia v. Jones, declaring invalid a regulation of the Washington Metropolitan Area Transit Commission, which had been intended to make unlawful the non-payment of the established bus fare. As a result, we are advised *that already some bus patrons have refused to pay the established bus fare.* We believe

[1]. The regulation, excluding the preamble, reads:

NOW, THEREFORE, BE IT ENACTED by the District of Columbia Council that:

Section 1. No person shall board a motor bus for hire without paying the established fare or presenting a valid transfer for transportation on the said motor bus.

Section 2. Violation of this regulation shall be punishable by a fine not to exceed $300 or imprisonment not to exceed ten days, or both.

Section 3. This regulation shall take effect immediately upon enactment and shall remain in effect for a period of 120 days thereafter.

that unless a proper regulation is adopted immediately, this practice will continue and escalate, and will cause serious disruption in transit service.

Consequently, this Commission requests that you ask the City Council immediately to adopt such a regulation. [Emphasis added.]

Commissioner Washington then sent to Mr. Gilbert Hahn, Jr., the then Chairman of the District of Columbia Council, the following communication.

Dear Chairman Hahn:

Immediate action by the City Council under the authority of Section 1–1505(c) (D.C.Code) is requested to deal with *an emergency concerning the public transportation service in the District of Columbia.*

Prompt adoption of a regulation requiring transit riders to pay the fares as established by the regulatory authorities is needed.

I am attaching a communication of February 24, 1972, from Chairman Jeremiah C. Waterman of the Washington Metropolitan Area Transit Commission reporting the existence of this emergency.

Also enclosed is a draft of a proposed regulation which we believe will accomplish this purpose. [Emphasis added.]

Chairman Hahn in response to this request, and pursuant to 2 DCRR 1.2, issued a notice to Council members that a special meeting (of the Council) was to be held that afternoon (the 24th) at 2 p. m. to

. . . consider the adoption of a regulation which will impose criminal penalties upon any individual who refuses to pay the established fare or present a valid transfer to ride on buses in the District of Columbia.

On the bottom of this notice, seven of the other eight Council members signed a waiver of their right to 24-hours written notice of the calling of a special meeting.

At the special meeting the letter of Mr. Waterman, set out *supra*, was read to the Council. Additionally, the letter of Commissioner Washington requesting the meeting was introduced. The decision in District of Columbia v. Jones, *supra*, was discussed, as well as the Washington Daily News' headline. Deputy Mayor Watt expressed his opinion that a state of emergency existed, and Mr. Waterman testified that

. . . I've been in close communication with the D.C. Transit Company, and I understand that already, despite the fact that this opinion [District of Columbia v. Jones] was only handed down last night, there have been cases of refusal to pay the fare. Under the circumstances without any penalty being available, the practice would be that the bus driver, on refusal of [a] passenger to pay would have to pull his bus up to the curb, near telephone communications, call for his supervisor and endeavor to convince the passenger to pay his fare. Now this, if it happens in a number of cases, and we expect it to escalate, would result in a serious disruption of traffic and we already have a serious problem with the Metro construction, anyway; and the *Transit Commission is definitely of the view that this is an emergency that should be met by prompt action.* [Emphasis added.]

The Corporation Counsel for the District of Columbia stated that he likewise was of the opinion that an emergency existed. Then, in response to Councilwoman Haywood's question as to whether there would likely develop hostility between bus drivers and the public if the proposed regulation were not passed immediately, he responded:

I believe that whenever we have a situation like this where there is no law that can be invoked, the natural situation

[is] for a person to resort to self-help. It is when there is a resort to self-help that the imagination cannot really envision everything that can come about from that. By having the law available, the [bus] driver does not have to resort to self-help.

After further discussion the Council invoked its emergency procedures. A vote was then taken to allow Councilman Moore to abstain, and the regulation was passed unanimously (Councilman Moore abstaining). That same afternoon the regulation was approved by Commissioner Washington. It was published in the District of Columbia Register four days later on February 28, 1972.

Analyzing the foregoing, we are of the opinion that there is clearly substantial evidence on the record to support the Council's determination that an emergency existed. The letter and testimony of Mr. Waterman were strong evidence to support the Council's determination. In addition, the Council had the benefit of the advice of Deputy Mayor Watt, as well as the legal opinion of the Corporation Counsel. On this record the Council's finding that an emergency existed is fully supported.

Appellant further contends that the Council did not follow its own emergency procedural rules in that the regulation was not read to the Council "including all its 'whereases' and all its sections."[2] Initially, we note that appellant does not contend that the Council's actions were in violation of the District of Columbia Administrative Procedure Act—only that it failed to comply with its own rules of procedure. This distinction is important because what appellant is urging is that this court should *interpret* the Council's own regulations in a manner which is inconsistent with the interpretation that the Council has given those same regulations. The Supreme Court in Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), when asked to do essentially the same thing, responded:

"Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. Bowles v. Seminole Rock Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700." [*Id.* at 16–17, 85 S.Ct. at 801.]

Appellant relies on 2 DCRR 6.1(b), which states in pertinent part:

No regulation, acted upon by the Council, shall become effective unless it shall have been at least twice theretofore read to the Council and at least twice theretofore passed by a majority vote of members of the Council present at the time of the vote, a quorum being present, and until signed by the Secretary, such readings and passage to be on two separate days not less than seven calendar days apart. . . .

and 2 DCRR 6.1(c), which reads:

Emergency Measures. Notwithstanding the language of Section [6.1(b)] above, upon the unanimous consent of the Councilmen present, emergency measures may be taken by regulation requiring only a single reading and single vote for passage.

2. Appellant's contention, that the Council's emergency procedures require that the regulation be published in the D.C. Register before the regulation is effective, flies in the face of 2 DCRR 2.6(b), which reads in pertinent part:

[I]f, in an emergency, the adoption of a rule is necessary for the *immediate preservation* of the public peace, health, safety, welfare or morals, such rule may be adopted as may be necessary in the circumstances and such rule may become *effective immediately* . . . . [Emphasis added.]

*See also* text *infra* at 640–641. No due process problem is raised because it is undisputed that appellant was informed of the existence and substance of the regulation before his arrest.

He contends that the only interpretation that is not plainly erroneous is that the entire regulation, "including all of its 'whereases and all its sections," must be orally read to the Council. We disagree. It is apparent that the "read to" language of 2 DCRR 6.1(b) is interpreted by the Council as requiring them to examine and discuss the regulation before them in detail (*i. e.,* official on-the-record consideration). Such an interpretation is reasonable in view of the fact that each Council member routinely has a copy of the proposed regulation before him. In the instant case the regulation, excluding its title and preamble, consisted of just three sections, each only one sentence long. It is undisputed that each Council member had a copy of the regulation at the meeting. Additionally, the title and the operative section (§ 1) were orally read to the Council by Chairman Hahn. The other two sections were discussed by one or more of the Council members although they were not orally read. On this record we find the Council's interpretation to be eminently reasonable.

The decision of the trial court is accordingly

*Affirmed.*