Opinion vacated. See 309 A.2d 97.

**CHEVY CHASE CITIZENS ASSOCIATION et al., and Mark M. Velsey, Petitioners,**

v.

**DISTRICT OF COLUMBIA COUNCIL, Respondent, Friendship Associates and Committee of 100 on the Federal City, Intervenors.**

**CHEVY CHASE CITIZENS ASSOCIATION et al., and Mark M. Velsey, Petitioners,**

v.

**DISTRICT OF COLUMBIA SURVEYOR, District of Columbia Council, and Commissioner of the District of Columbia, Respondents, Friendship Associates, Intervenor.**

Nos. 6489, 6579.

District of Columbia Court of Appeals.

Argued Sept. 27, 1972.

Decided June 26, 1973.

Peter A. Hornbostel for Chevy Chase Citizens Association, Friendship Citizens Association, Citizens Coordinating Committee on Friendship Heights, and Mark M. Velsey, petitioners in Nos. 6489 and 6579.

Peter S. Craig, Washington, D. C. for Committee of 100 on the Federal City, intervenor in No. 6489 and further petitioner in No. 6579.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Washington, D. C., Asst. Corp. Counsel, were on the pleadings, for respondents.

Norman M. Glasgow, Washington, D. C., with whom Whayne S. Quin, Washington, D. C. was on the pleadings, for intervenor Friendship Associates.

Before REILLY, Chief Judge, and NEBEKER and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Square 1660 in the District of Columbia is irregularly (almost triangularly) shaped. It is bounded by Wisconsin Avenue on the east, Western Avenue on the north, and Jenifer Street (which is doglegged) on the south and west. Roughly bisecting the square is the northernmost block of 44th Street, N.W. It is rather short, and runs a somewhat doglegged course from Jenifer Street to Western Avenue.

That general area, lying within what is known as Friendship Heights, has been and is one of vigorous economic development. The proceeding before us arises from the government's decisions (1) to close that block of 44th Street, and (2) once closed, to convey title to the street to the abutting landowners.

The dispute is of a type which has become relatively commonplace in contemporary urban America. Investor-developers seek to achieve the maximum return from land which now is manifestly underutilized; citizens' groups seek to limit the intended development of the land, in this case by preventing the street closing. It is a part of the function of local government to resolve such a controversy; it is part of the function of this court to determine the legality of the manner in which such a controversy has been resolved. We conclude that the type of hearing to which petitioners were entitled was not afforded them by the District of Columbia Council, and that the rulings below must be set aside.

I

This case includes a considerable number of facts and issues which are not of decisional relevance. The following factual recitation is limited to those matters having a significant bearing on our disposition of the proceeding.

The land within Square 1660 to the east of 44th Street is owned by intervenor Friendship Associates. It has no structures on it. The two lots to the west of 44th Street are owned by other parties, and are being used as a parking lot for the Lord & Taylor department store. The square footage of the block of 44th Street which lies between those two plots is slightly in excess of 30,000 (approximately seven-tenths of an acre).

On November 16, 1970, the owners of the land on both sides of 44th Street jointly requested that the street be closed pursuant to The Street Readjustment Act of the District of Columbia (hereinafter

SRA).[1] The formal application was filed with the District of Columbia Surveyor.[2] It was proposed that title to the eastern portion of 44th Street would revert from the District of Columbia to Friendship Associates, with the other portion reverting to the owners of the property on the west. At the same time, Friendship Associates submitted a separate proposal that the entire square be rezoned from C–3–A to C–3–B. (Among other factors, such a zoning change would increase the permissible building height from 60 feet to 90 feet and would authorize a higher floor area ratio.)

Section 7–401 of the District of Columbia Code requires the referral of a proposed street closing "to the National Capital Planning Commission [NCPC] for its recommendation." The NCPC's Transportation Committee reported favorably on the proposed closure on November 4, 1971. Subject to certain conditions which were agreed to by Friendship Associates, all affected utilities and District of Columbia government departments agreed to the closing.[3] On February 24, 1972, the NCPC formally notified the District of Columbia Council of its approval of the proposal. The letter to the Council from the NCPC's Executive Director stated in part: "From the city planning and transportation point of view, the closing of 44th Street is desirable regardless of any zoning changes or any new development in this vicinity."

By letter to the Council dated January 11, 1972, counsel for Friendship Associates requested that the street closing proposal be set for hearing on February 14, 1972. However, on February 7, 1972, this court issued its decision in Capitol Hill Restoration Society v. Zoning Commission, D.C. App., 287 A.2d 101 (1972), holding under the facts there presented that a zoning controversy was a "contested case" as defined in the District of Columbia Administrative Procedure Act (DCAPA). D.C.Code 1972 Supp., § 1–1502(8). Such a conclusion necessitated full compliance in the *Capitol Hill* case with the procedural requirements for contested cases as set forth in D.C. Code 1972 Supp., § 1–1509.

The street closing hearing which had been requested for February 14 was rescheduled to February 28, in order to afford the parties time to consider whether the *Capitol Hill* decision would have any bearing on the proposals to close 44th Street and rezone Square 1660. On February 28, Friendship Associates filed a new street closing application specifying conformity with existing zoning. The rezoning application was withdrawn by Friendship Associates, and the street closing hearing was rescheduled for March 20.[4]

On March 20, Friendship Associates submitted extensive documentary support for the proposed street closing. The hearing was presided over by then-Council member Henry K. Willard, who was the acting Chairman of the Council's Transportation Committee. The hearing also was attended by the Council's then-Chairman, Gilbert

---

1. D.C.Code 1967, §§ 7–401 through 7–404, D.C.Code 1972 Supp., § 7–405, and D.C. Code 1967, §§ 7–406 through 7–410.

2. The application was submitted pursuant to Street and Alley Closing Regulations which were adopted by the former Board of Commissioners on November 2, 1967. Order No. 67–1701, 14 D.C.Reg. 111 (Dec. 4, 1967). As noted *infra*, those regulations no longer are legally effective.

3. Friendship Associates agreed to deposit $5,650 with the Treasurer of the District of Columbia "to cover possible costs to the District in connection with the clos-

ing", it agreed to bear costs of $51,850 for relocating a Potomac Electric Power Company line, it proposed expenses of some $100,000 in connection with a new sewer line, it contemplated road improvement expenditures in excess of $200,000, and it proposed to make a contribution to Metro facilities on the property in excess of $400,000.

4. Notice of the rescheduled hearing was given as required by D.C.Code 1967, § 7–402. Abutting property owners received formal written notice; notice to others was given by publication.

Hahn, Jr. The *opponents of the street* closing sought to have the proceeding conducted as a contested case under the DCA PA, with full rights (including that of cross-examination) as set forth in D.C. Code 1972 Supp., § 1–1509. Chairman Hahn rejected such requests, stating in part:

> The Council has heretofore considered this matter and regards that all the matters it handles are legislative in nature and that's our view of the matter. The chair's ruling throughout will reflect this point of view.
>
> .    .    .    .    .    .
>
> [W]e are not subject to the Administrative Procedure Act, precisely that's not a contested case and it is for that reason that the Capitol Hill case does not apply. * * * If we are wrong, we are wrong. There can't be anything in between about it.

For reasons explained below, we hold that the proceeding was a contested case. However, that conclusion is not intended to imply criticism of the nature of the legislative type of hearing which was afforded by the limited number of Council members who participated. The hearing was conducted with thoroughness and courtesy. Numerous written statements and exhibits were received. All three private counsel who argued before us participated in the Council's hearing. Five witnesses testified in favor of the proposed street closing; 14 were heard in opposition. The transcript of the testimony is 180 pages long; all who wished to speak were given full opportunity to do so. Subsequent to the hearing, the record was held open to permit the filing of pleadings in both support of and opposition to the proposal. Overall, the proceeding reflected careful attention to the issues at hand.

The Council met on May 2, 1972. The minutes of the meeting reflect that six members were present, two were absent, and that the new Chairman, John A. Nevius, "had not assumed his duties as such."

When the 44th Street case was reached, one member was out of the room, so five members were in a position to participate. Of the five, only Councilman Willard had been present at the actual hearing on the closing of 44th Street. He reported to the others on the hearing, and the subject was discussed. Thereafter, the resolution to close 44th Street (Resolution No. 72–30) was adopted by unanimous vote. An order to such effect was prepared, and notice thereof was given as contemplated by D. C.Code 1967, § 7–404.

The opponents of the closing then sought post-hearing relief from the Council, filing objections and requesting reconsideration and a stay. In response to those pleadings, in early June of 1972 the Special Counsel to the Council addressed similar letters to the two attorneys for the petitioners. The substance of the Council's position was stated in one of those letters (dated June 1, 1972) as follows:

> The Council considers the action taken in ordering the closing of 44th Street as legislative in character. Consequently, the petition seeking a reconsideration or stay falls outside the scope of actions available to the Council on this matter.

In the meantime, on May 23, 1972, the petition for review of the street closing order had been filed in this court in Case No. 6489. On June 19, 1972, pursuant to Council authorization, the District of Columbia Surveyor officially decreed that title to the closed portion of 44th Street "shall revert to the owners of the abutting property." The petitioners in our Case No. 6579 sought review of that action on June 27, 1972. By order dated July 19, 1972, this court (1) *denied motions to dismiss* which had been filed by the government and Friendship Associates, (2) granted motions for a stay of the action of the Council, and (3) vacated the order of the Surveyor which provided for reversion of the title to 44th Street to the owners of the abutting land.

## II

This is the first case in which this court has asserted direct appellate jurisdiction over an action taken by the District of Columbia Council.[5] In light thereof, the factors leading to the result reached should be recited with specificity.

The government (whose view is shared by intervenor Friendship Associates) contends that we should refrain from exercising jurisdiction on the grounds that in closing that block of 44th Street, "the Council was not making an adjudicatory ruling in a contested case, but was clearly acting in a legislative manner in articulating a policy applicable to the public generally."

Until 1967, the local aspects of District of Columbia government were handled by a three-man Board of Commissioners, which operated with divided rather than collective authority.[6] It was structured to function in either a quasi-adjudicative or a quasi-legislative manner, depending upon the nature of the matter with which a particular Commissioner was dealing.

On June 1, 1967, then-President Johnson sent to the Congress what was designated as Reorganization Plan No. 3 of 1967. The letter of transmittal which accompanied it stated in part:

> The plan would abolish the present Board of Commissioners of the District of Columbia. Its powers and responsibilities would be apportioned between the single Commissioner and the Council.

> The Commissioner would be assigned the executive functions now vested in the Board of Commissioners. He would be given responsibility and authority to organize and manage the District government, to administer its programs and to prepare its budget. * * *

> The Council would be assigned the quasi-legislative functions now performed by the Board of Commissioners. The plan describes more than 430 functions which would be transferred to the Council. These include major responsibilities, such as the approval of boundaries and plans for urban renewal, establishment of rules governing the licensing of professions, and setting of rates for property taxation.[7]

The proposed plan was unaltered by Congress and became effective. Item 168 of the plan specifically transferred to the Council the following function: "Closing any street, road, highway, or alley, or any part of any thereof (including the making of the required finding thereon) under D. C.Code, sec. 7–401."[8]

There is, then, no question but that Reorganization Plan No. 3 of 1967 conveyed the disposition of street closings to a quasi-legislative body. However, this fact does not support respondents' contentions, for two principal reasons. First, when Congress delegated the street closing authority, it prescribed certain standards relating thereto, and thus the Council does not enjoy the type of freedom normally possessed by a purely legislative body. D. C.Code 1967, § 7–401. Second, whether the Council is a legislative type of body is essentially irrelevant to a determination of the crucial question, which is whether a matter entrusted by Congress to the Council for handling may be a contested case. We conclude that it may.

5. Indirect review of the Council's action in adopting a particular regulation was had in affirming a conviction thereunder in Hobson v. District of Columbia, D.C. App., 304 A.2d 637 (1973).

6. The responsibilities of the Board were split as follows: (1) a Commissioner of Public Health and Welfare, (2) a Commissioner of Public Safety, and (3) a Commissioner of Public Works.

7. H.R.Doc.No.132, 90th Cong., 1st Sess., iv (1967); also printed in D.C.Code 1972 Supp., App. to Title 1, p. 67.

8. *Id.* at 13; also at D.C.Code 1972 Supp., p. 60.

The unique governmental status of the District of Columbia produces unique legal problems.[9] For many years, the relatively simple act of closing an alley or a street, for whatever purpose, required a special act of the Congress of the United States (even when the street existed solely on a map). The inefficiency of such a mechanism was remedied to a modest degree on January 30, 1925, when Congress passed what remains in today's District of Columbia Code as sections 7–123 and 124 thereof. The circumstances under which the Commissioners thus were empowered to close streets were rather limited, however, which led to the passage in 1932 of the Street Readjustment Act.

During the Senate hearing on the SRA, two problem areas in the proposed legislation received particular attention. One resulted in a change in the Act as passed; the other did not.

That which was modified warrants brief comment. As originally proposed, the Commissioners' power to close streets would have been subject to the approval of what was then known as the National Capital Park and Planning Commission (now the National Capital Planning Commission). Such a provision would have given the Commission, a federal agency, an absolute veto power over street closing actions contemplated by local officials. In response to vigorous objections to such a power, the bill was amended to provide simply that any street closing proposal "shall be referred to the [National Capital Planning Commission] for its recommendation." D.C.Code 1967, § 7–401.

The other principal subject of discussion at the Senate hearing was whether the SRA should provide specifically for an appeal to the courts. The question was raised repeatedly. Hearings on S. 3532 Before the Senate Comm. on the District of Columbia, 72d Cong., 1st Sess. 14, 17–22, 27–29, 31–32 (1932). The District of Columbia's then-Principal Assistant Corporation Counsel testified in part as follows:

> This bill does not provide for appeal to the courts from the determination of the commissioners that a street should be closed, and in my opinion there should be no such appeal. I know of no courts in the country that are more jealous of the rights of citizens than the courts of the District of Columbia, and time and time again they have said that the courts are open to protect the citizens against arbitrary action on the part of officers, either of the Federal Government or of the District of Columbia. In other words, it requires no statute to give the courts the right to enjoin any arbitrary action taken by the officers. So if the commissioners should determine that a certain street should be closed, with almost no evidence before them of the necessity of such closing, I have no hesitancy in saying that the action of the commissioners will be enjoined by our courts. *Id.* at 20–21.

Whether such a statement fully satisfied those Senators who were concerned about the problem is not known, but no statutory reference was made to appeals of street closing actions.[10]

9. This fact often renders cases from other jurisdictions of relatively little guidance. For cases where proceedings before quasi-legislative bodies have been treated as contested cases, see Hyson v. Montgomery County Council, 242 Md. 55, 217 A.2d 578 (1966); Hixon v. Pub. Serv. Comm'n, 32 Wis.2d 608, 146 N.W.2d 577 (1967). For cases which are representative of other approaches to the problem, see People v. City of Chicago, 13 Ill.2d 157, 148 N.E.2d 481 (1958) (alley closed by city council); Perellis v. Mayor and City Council of Baltimore, 190 Md. 86,

57 A.2d 341 (1948) (street closed by city council ordinance); In re Pleasant View Subdivision, 2 Mich.App. 654, 141 N.W.2d 380 (1966) (street closed through petition to court); In re Roadway in Section 21, Township 60, Range 6, W., 357 S.W.2d 919 (Mo.1962) (street closed in court proceeding); Clifford v. City of Cheyenne, 487 P.2d 1325 (Wyo.1971) (street closed by ordinance of city council).

10. The SRA does provide, as discussed *infra,* for trial court action for "the as-

As the SRA was written, the type of hearing intended was more legislative than judicial in nature. Section 7–402 of the D.C.Code provides for publication of a notice of an intention to close any street (or road, highway, or alley or any part thereof), with that notice to include a statement "to the effect that a public hearing will be held at a time and place stated in the notice for the hearing of objections, if any, to such closing." The statute further provides that owners of abutting property are to be given notice by registered mail, and that at the hearing "the property owners or their representatives, and any other persons interested, shall be given an opportunity to be heard."

Such language is consistent with the manner in which Congress itself functions (recognizing, as mentioned supra, that Congress in enacting § 7–401 established certain criteria which must be met before a street may be closed pursuant to the delegated authority). Thirty-five years went by after the passage of the SRA, with no court challenge to the legality of a street closing action. Then, in 1967, two disparate but interrelated legislative developments progressed on parallel courses. One was Reorganization Plan No. 3 of 1967, which has been discussed above; the other was the District of Columbia Administrative Procedure Act.

When the DCAPA began its course through Congress, the Board of Commissioners was in existence. Thus, throughout the early versions of the DCAPA, references were to proceedings "before the Commissioners or any agency." When Reorganization Plan No. 3 of 1967 became effective, the references in the pending legislation to "the Commissioners" became obsolete. Accordingly, Congress amended the DCAPA prior to its enactment to make it applicable to appropriate proceedings

"before the Commissioner, the Council, or any agency. . . ." D.C.Code 1972 Supp., §§ 1–1501–1–1510.

As has been noted, the Council's position is that its actions are purely legislative and hence not subject to the DCAPA. In light of the specific and repeated inclusion of the Council within the DCAPA, such a position would be sustainable only if we were to conclude that Congress' substitution of "the Commissioner or the Council" for "the Commissioners" in the DCAPA was inadvertent. However, "[w]e are entitled to assume that . . . Congress legislated with care". Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 1675, 36 L.Ed. 2d 342 (1973).

Any possible doubt as to the potential reviewability of actions of the Council was removed when Congress enacted the District of Columbia Court Reorganization Act of 1970. In delineating this court's current jurisdiction, Congress in part provided:

> The District of Columbia Court of Appeals has jurisdiction . . . to review orders and decisions of the Commissioner of the District of Columbia, the District of Columbia Council, any agency of the District of Columbia . . ., and the District of Columbia Redevelopment Land Agency, in accordance with the District of Columbia Administrative Procedure Act. . . . D.C.Code 1972 Supp., § 11–722.

■ To us the conclusion is inescapable that a proceeding before the Council may be a contested case, and, if it is, an order resulting therefrom is directly reviewable in this court. We turn now to the reasons for our correlative conclusion that the closing of 44th Street was a contested case.

certainment of damages and the assessment of benefits resulting from such [street] closing and abandonment." D.C. Code 1972 Supp., § 7–405. Appellate review routinely may be had of such a

"reverse condemnation" case. See Woodbury v. District of Columbia, 67 App. D.C. 278, 92 F.2d 202 (1937) ; S.Rep.No. 688, 72d Cong., 1st Sess. 2 (1932).

One fact is made clear by the DCAPA: the line is not drawn between a quasi-adjudicative proceeding and a quasi-legislative proceeding. Rather, the dichotomy is between the contested case and that which is not a contested case. *See* Citizens Association of Georgetown, Inc. v. Washington, D.C.App., 291 A.2d 699, 703 (1972); Capitol Hill Restoration Society v. Zoning Commission, *supra,* 287 A.2d at 103. While this fact unavoidably necessitates subjective judgments on a case-by-case basis as to when the full protections of the DCAPA come into play, it reflects a recognition by Congress of the unusual status and structure of the District of Columbia government.

In relevant part, the DCAPA defines a contested case as

a proceeding before the Commissioner, the Council, or any agency in which the legal rights, duties, or privileges of specific parties are required by any law (other than this chapter), or by constitutional right, to be determined after a hearing before the Commissioner or the Council or before an agency . . . . D.C.Code 1972 Supp., § 1–1502(8).

■ One observation, perhaps obvious, warrants mention. The word "contested" in the term "contested case" has a vital meaning, although it is not repeated in § 1–1502(8). Illustratively, a contemplated alley or street closing which has no legally cognizable opposition does not become a contested case simply because the other elements of a contested case may be present. Conversely, the existence of opposition to a proposed governmental action, in and of itself, does not give rise to a contested case; all statutory requirements must be met. Citizens Association of Georgetown, Inc. v. Washington, *supra.*

■ In this proceeding, the contest was manifest. Multiple citizens groups, at least some of which apparently included nearby property owners and users of the street, vigorously opposed the closing. That the SRA requires a hearing is beyond question. D.C.Code 1967, § 7–402. Similarly beyond question is the fact that the closing of that particular street and the reversion of the title thereto to the abutting property owners determined "the legal rights, duties, or privileges of specific parties". Although Congress originally might have contemplated a legislative type of hearing when it enacted the SRA, any such contemplation was overridden by the enactment of the DCAPA, which does not differentiate between types of hearings in defining a contested case.[11] Further, the factual questions before the Council in its consideration of whether to close the street were adjudicative rather than legislative in nature.[12] Considering all of the circumstances, the proceeding below should have been treated as a contested case. Erroneously, it was not.

### III

Petitioners have raised numerous legal challenges to the actions of the Council and the Surveyor. Certain of their arguments do not require treatment; two additional ones, fully briefed and argued, do.

### (a) The Highway Plan Problem

Petitioners contend that the Council exceeded its jurisdiction in closing 44th Street since that particular block remains on what is known as the highway plan.

---

11. Note, for example, the provision in D.C. Code 1972 Supp., § 1–1509(b), that "in contested cases . . . the proponent of *a rule or order* shall have the burden of proof." (Emphasis added.) *See also* Allentuck v. District of Columbia Min. Wage & Indus. Safe. Bd., D.C.App., 261 A.2d 826, 832 (1969).

12. The essence of legislative action is the absence of any obligation to make findings of fact, but the criteria established by § 7–401 of the SRA necessitate factual findings. See also Item 168 of Reorganization Plan No. 3 of 1967, which specifically refers to the Council's obligation to make "the required finding" under § 7–401. *Supra* note 8.

As a corollary to that argument, petitioners argue that the closing was void because it allegedly was done for private rather than public reasons. Those positions are invalid.

■ Section 7–401 of the Code includes three provisional clauses, only one of which relates to the highway plan. That clause is written in the disjunctive, stating in part as follows:

*Provided further,* That the said closing by said [Council] is made expedient or advisable *by reason of change in the highway plan* or by reason of provision for access or better access to the abutting or nearby property and the convenience of the public by other street, road, highway, or alley facilities, . . . or for other public reasons: . . .

Clearly a change in the highway plan provides only one possible basis for a street closing under the SRA; nowhere does it appear that Congress intended a highway plan modification to be a prerequisite to a closing.[13]

■ Petitioners' contention that the closing was invalid because it served private rather than public purposes similarly is unpersuasive. Abutting property owners specifically are authorized by § 7–408 of the Code to petition for a street closing. As long as the Council reasonably concludes that a particular street closing is justified by and consistent with at least one of the criteria set forth in § 7–401, its action may be sustained, irrespective of possible private benefits.

■ Over and above city planning and transportation factors, § 7–401 authorizes street closings "for other public reasons". Such a term is to be construed broadly. The land abutting the subject block of 44th Street is manifestly underutilized at the present time, while extraordinary economic development has occurred across Western Avenue in Montgomery County, Maryland. The record reflects the Council's consideration of substantial District of Columbia tax revenues (including property, income, and sales taxes) which would be generated by having retail and other income-producing facilities on the land in question, as well as of the jobs which would be created within the District of Columbia by Friendship Associates' intended development. These and related factors constitute "other public reasons" which properly may be considered by the Council in the exercise of its informed judgment as to whether a particular street should be closed.

(b) The "Reverse Condemnation" Problem

Section 7–401 of the Code provides that when in the Council's judgment a street is "useless or unnecessary" and hence may be closed,

the title to the land embraced within the public space so closed [shall] revert to the owners of the abutting property subject to such compensation therefor in money, land, or structures as the [Council] of the District of Columbia, in [its] judgment, may find just and equitable, in view of all the circumstances of the case affecting near-by property of abutters and/or non-abutters: . . . .[14]

---

13. Further, as a practical matter, highway plan control is vested in the Council, subject to the approval of the NCPC. D.C.Code 1967, §§ 7–108 and 122; D.C. Code 1972 Supp., App. to Title 1, p. 59, items 153 and 156, and p. 60, item 158. The NCPC specifically approved the closing of 44th Street.

14. Since the compensation portion of the statute is linked to the effect of the closing on the nearby property of abut-

ters and/or nonabutters, it has been held that the Council is not free to apply a "fair market value" concept in considering possible compensation from abutting owners for the property which reverts to them upon the closing of a street or alley. Carr v. District of Columbia, 312 F.Supp. 283 (D.D.C.1970), aff'd by judgment, D.C.Cir., Sept. 28, 1971. As the court stated in Carr (*id.* at 285–286):

It does not appear that the idea of assessing abutting property owners the

Separate from the Council's authority to consider compensation for a closed street, but related thereto, is what is generally referred to as the reverse condemnation provision of the S.R.A. D.C.Code 1972 Supp., § 7–405. It provides for an in rem proceeding in the Superior Court for "the ascertainment of damages and the assessment of benefits resulting from [a] closing and abandonment" where a timely "objection" to a street closing has been filed by a "party interested" under D.C.Code 1967, § 7–404.[15]

■ The intended interrelationship is clear. First, in deciding to close a street, the Council has the discretion to consider ordering compensation from the abutting owners, considering all circumstances "affecting near-by property of abutters and/or nonabutters." If an abutting owner feels that the compensation he has been assessed is too high, or should a nearby property owner consider himself damaged by the closing, either of such a "party interested" may submit an objection to a closing under § 7–404, following which the Council is obliged to institute a reverse condemnation proceeding under § 7–405.

One other factor is relevant to petitioners' arguments on this subject. Read together, §§ 7–405 and 7–407 decree that title to a closed street may not be conveyed effectively to the abutting owners until a reverse condemnation proceeding—if one becomes necessary—has been concluded.

Petitioners sought to submit formal "objections" to the closing under § 7–404. However, the Corporation Counsel advised the Council that §§ 7–404 and 405 provide a remedy which is available solely to abutting property owners. Since none of petitioners is an abutter, based upon such advice the Council refused to institute a reverse condemnation proceeding and authorized the Surveyor to make the street closing effective. Petitioners contend that this was error.

■ The record does not reflect petitioners' specific property interests. However, principles of efficient judicial administration require us to state our conclusion that the position of the Corporation Counsel was erroneous. Reverse condemnation is not limited to holders of abutting interests; it is available to nearby nonabutting property interests as well, for such a party could be damaged cognizably by a street closing action. It is, however, limited to the holders of specific property interests (who would have the burden of proving their individual damages in Superior Court), and is not to be instituted upon the filing of an objection either by an association which itself has no nearby property rights or by a mere taxpayer purporting to act on behalf of the public.[16] Further, any benefits assessed against abutting owners in such a proceeding are related to the damages caused by the closing, with, as noted, a fair market value yardstick being

---

fair market value of the public space reverting to them was considered by Congress. The principal economic purpose of the [SRA] was the savings that would be entailed in maintenance costs by virtue of the closings as well as the elimination of barriers to real estate development in the District.

15. In defining a contested case, the DCAPA excludes "any matter subject to a subsequent trial of the law and the facts de ‑novo in any court". D.C.Code 1972 Supp., § 1–1502(8). The merits of a street closing decision are irrelevant to the question of possible damages or benefits in a reverse condemnation proceed-

ing, so the statutory exclusion is inapplicable to cases under the SRA.

16. This fact in no way limits the rights of an association in the hearing on a proposed closing, nor does it inhibit an association's right to seek review of a street closing action under the DCAPA.

It should be noted that a petition for review is to be filed within 15 days of Council action ordering a street closing, D.C.App.R. 15(b), while the statute allows 30 days for the filing of an objection under § 7–404. If a petition for review then were pending in this court, consideration could be given to the filing of an appropriate motion to stay the appellate proceeding.

inappropriate. Carr v. District of Columbia, *supra* n. 14.

## IV

■ We recognize that the Council's makeup and its time commitments (meeting normally only twice monthly) are not such as to lend themselves readily to even a majority's actually hearing the evidence in a contested case. We further recognize that the Council's present staff structure does not include a full-time hearing officer.[17] However, a hearing officer readily may be designated to conduct a proceeding such as this one on remand, so long as the Council follows the requirements of the DCAPA, including affording the opportunity for argument to be submitted as required by D.C.Code 1972 Supp., § 1–1509(d).[18]

As noted, the Council has considered itself exempt from the contested case provisions of the DCAPA. As a consequence of that belief, no rules for the handling of such proceedings have been adopted by the Council as contemplated by the DCAPA.[19] Additionally, the Street and Alley Closing Regulations which were adopted by the former Board of Commissioners on November 2, 1967 (14 D.C.Reg. 111) no longer are effective, since they were not compiled, indexed and published subsequent to the effective date of the DCAPA as required by D.C.Code 1972 Supp., § 1–1507. Both of these procedural matters call for the Council's careful attention.

■ In a contested case, the proponent of an order has a statutory burden of proof. D.C.Code 1972 Supp., § 1–1509(b). Notwithstanding that burden, the proponent of an order enjoys no lesser rights than do the opponents thereof. In a proceeding such as this, this means that a street closing's proponents are entitled to develop on the record the identity and property interests of any groups or individuals opposing the proposed closing. This is appropriate not only to enable the Council to make a fully informed judgment as to the merits of a controversy, but also to assist this court in making future judgments as to whether a petitioner for review under § 1–1510 is a "person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Commissioner or Council or an agency in a contested case".[20]

## V

Accordingly, the renewed motions to dismiss the petitions for review are denied, the orders under review are set aside, and the proceeding is remanded to the Council.

Reversed and remanded.

---

17. During the hearing before then-Council member Willard, he stated: "We do not have hearing officers per se, we have Councilmen-Committeemen, who conduct the hearings."

18. Assuming the Council elects to designate a hearing officer to conduct a case such as this, there is no impediment to using that officer's findings of fact and conclusions of law as the Council's proposed decision. *See* Carey v. District Unemp. Comp. Bd., D.C.App., 304 A.2d 18, 20–21 (1973).

19. The Council's existing rules constitute Title 2 of the District of Columbia Rules and Regulations. Although the numerous proposed street and alley closings considered by the Council are indexed in the D.C.Register as "proposed rulemaking," in handling closings the Council does not purport to follow its procedures for the adoption of regulations. See 2 DCRR 6.1(b).

20. The government and intervenor Friendship Associates challenge petitioners' standing to seek review of the Council's action herein. However, since petitioners were denied the hearing rights to which they were entitled, certainly they suffered a legal wrong by virtue of the rulings below. Additionally, while the record is unclear as to the precise interests of petitioners, they have alleged direct injury to their members as users of 44th Street, and this factor also appears to make them properly before this court. *E. g.*, Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed. 2d 636 (1972); N.A.A.C.P. v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963); *cf.* Bd. of Elections v. Democratic Central Comm., D.C.App., 300 A.2d 725 (1973).