**CHEVY CHASE CITIZENS ASSOCI-
ATION et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA COUNCIL,
Respondent,**

**Friendship Associates and Committee of 100
on the Federal City, Intervenors.**

**CHEVY CHASE CITIZENS ASSO-
CIATION et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA SURVEYOR et
al., Respondents,**

**Friendship Associates, Intervenor.**

**Nos. 6489, 6579.**

District of Columbia Court of Appeals.

Argued en banc Nov. 1, 1973.

Decided Oct. 22, 1974.

See also, D.C.App., 309 A.2d 97.

Peter A. Hornbostel, Washington, D. C., for Chevy Chase Citizens Association, Friendship Citizens Association, Citizens Coordinating Committee on Friendship Heights, and Mark M. Velsey, petitioners in Nos. 6489 and 6579.

Peter S. Craig, Washington, D. C. for Committee of 100 on the Federal City, intervenor in No. 6489 and further petitioner in No. 6579.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the pleadings, for respondents.

Norman M. Glasgow, Washington, D. C., with whom Whayne S. Quin, Washington, D. C., was on the pleadings, for intervenor Friendship Associates.

Before REILLY, Chief Judge, and KELLY, FICKLING, KERN, GALLAGHER, NEBEKER, PAIR,* YEAGLEY and HARRIS, Associate Judges.

FICKLING, Associate Judge:

These consolidated cases involve petitions to review the decisions of the District of Columbia Council (hereinafter, Council) made pursuant to The Street Readjustment Act of the District of Columbia [1] (hereinafter, SRA) (1) to close the portion of 44th Street, Northwest, which lies between Jenifer Street and Western Avenue, and (2) once closed, to authorize the District of Columbia Surveyor to convey title to the street to the abutting landowners. The government and intervenor Friendship Associates contend that a proceeding to close a street under the SRA is not a "contested case" as defined by D.C.Code 1973, § 1–1502(8), of the District of Columbia Administrative Procedure Act [2] (hereinafter, DCAPA); therefore, this court lacks jurisdiction to directly review the challenged decision of the Council under the DCAPA's judicial review provision, D.C.Code 1973, § 1–1510. We agree.

I

The portion of 44th Street in question is located in Friendship Heights, an area

* Retired as of April 14, 1974.

1. D.C.Code 1967, § 7–401 et seq.

2. D.C.Code 1973, § 1–1501 et seq.

which has undergone vigorous economic development in recent years. The land east of the street is owned by intervenor Friendship Associates and has no structures on it. The land west of the street is owned by other parties; it is currently being used as a parking lot for the Lord and Taylor department store. The street is 30,200 square feet in area (approximately 0.7 acre).

On November 16, 1970, all the abutting landowners on 44th Street joined in a petition—filed pursuant to D.C.Code 1967, § 7–408—requesting that the street be closed, with title thereto reverting from the District to them. The purpose of the proposed closing was to facilitate the construction of an office building with commercial and retail facilities.

This petition was thereafter processed through relevant District government departments and all affected utilities for comment. Both the government departments and the utilities agreed to the proposed street closing as long as certain conditions—which were agreed to by Friendship Associates—were met. The petition was additionally referred to the National Capital Planning Commission (NCPC) for its recommendations as required by D.C. Code 1967, § 7–401. The NCPC by letter dated February 24, 1972, similarly approved the proposed closing. The letter stated in part:

> From the city planning and transportation point of view, the closing of 44th Street is desirable regardless of any zoning changes or any new development in this vicinity. In our opinion the elimination of the turning movements produced by the intersection of Western Avenue and 44th Street would substantially improve the present traffic circulation in this area.
>
> . . . In addition, since the Comprehensive Plan for the National Capital designates this area as an uptown center, this closing is consistent with the adopted major thoroughfare plan approved by

the City Council which indicates that this street is not needed for major traffic movements.

In accordance with D.C.Code 1967, § 7–402, a public hearing—at which "the property owners or their representatives, and any other persons interested, shall be given an opportunity to be heard"—was scheduled to be held on February 14, 1971, before the Transportation Committee of the Council. This hearing however was rescheduled for February 28, and then rescheduled again for March 20. As required by Section 7–402, abutting property owners received formal written notice of the March 20 hearing, whereas other persons interested received notice by publication.

The public hearing on March 20 was presided over by then-Councilman Henry K. Willard, who was the acting chairman of the Council's Transportation Committee. All persons interested were given an opportunity to express their views regarding the proposed street closing. Friendship Associates offered into evidence extensive documentary support for the closing. Five persons testified in favor of the closing, whereas 14 testified in opposition. Requests were made by counsel for two of the opponents to have the proceeding conducted as a "contested case" under the DCAPA, with the procedures (including cross-examination) that are set forth in D.C.Code 1973, § 1–1509. These requests were denied.

On May 2, 1972, the Council met to discuss, among other things, the proposed street closing. Councilman Willard delivered a report to the Council recommending the street be closed. Following a discussion of the report, the Council unanimously voted to adopt Resolution No. 72–30 to close 44th Street. Public notice of the resolution was given as required by D.C.Code 1967, § 7–404.

On May 23, 1972, petitioners sought review of the street closing order in this court in Case No. 6489. On June 19, 1972,

pursuant to Council authorization, the District of Columbia Surveyor officially ordered that title to the closed portion of 44th Street "shall revert to the owners of the abutting property." Petitioners likewise sought review of this action on June 27, 1972, in this court in Case No. 6579.

## II

The judicial review provision of the DCAPA provides for direct review to this court of a decision by the Council only in a "contested case."[3] D.C.Code 1973, § 1–1510. In pertinent part, the DCAPA defines "contested case" as follows:

> [T]he term "contested case" means a proceeding before the Commissioner, the Council, or any agency in which the legal rights, duties, or privileges of specific parties are required by any law (other than this chapter), or by constitutional right, to be determined after a hearing before the Commissioner or the Council or before an agency, but shall not include (A) any matter subject to a subsequent trial of the law and the facts de novo in any court. . . . [D.C.Code 1973, § 1–1502(8).]

Thus, the issue we must determine is whether the proceeding here, to close a public street pursuant to the SRA, was a "contested case" within the meaning of the DCAPA.

We begin our analysis by reviewing, as this court did in Capitol Hill Restoration Society v. Zoning Commission, D.C.App., 287 A.2d 101 (1972), the legislative history of the term "contested case." The term is taken from the definition in the Revised Model State Administrative Procedure Act of 1961 (hereinafter, Model Act),[4] and is intended to be synonymous with adjudication as defined by the Federal Administrative Procedure Act (hereinafter, Federal APA)[5] with the exception of ratemaking.[6] Under the Model Act ratemaking is considered adjudication, whereas under the Federal APA it is classified as rulemaking.[7] The term "contested case" is used in the Model Act to avoid confusion in terminology that might result from this distinction.[8] Since the drafters of the Model Act intended principles similar to those embodied in the Federal APA to govern the term "contested case," we look for guidance not only to state precedents interpreting "contested case" definitions taken from the Model Act, but also to Federal APA precedents as well. See Capitol Hill Restoration Society v. Zoning Commission, supra at 104–105.

■ An administrative proceeding is primarily adjudicatory—and therefore governed by "contested case" procedural requirements[9]—if it is concerned basically with weighing particular information and arriving at a decision directed at the rights of specific parties. Citizens Association of Georgetown, Inc. v. Washington, D.C.App., 291 A.2d 699, 703–704 (1972); Capitol Hill Restoration Society v. Zoning Commission, supra. On the other hand, an administrative proceeding is not subject to "contested case" procedural requirements if it is acting in a legislative capacity, making policy decisions directed toward the general public. Id.

---

3. The SRA does not provide for direct review of the Council's decision to this court.

4. Section 1(2) of the Model Act defines "contested case" as:
   a proceeding, including but not restricted to ratemaking and licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing.

5. " '[A]djudication' means agency process for the formulation of an order." 5 U.S.C. § 551 (7) (1970). " '[O]rder' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." Id., § 551 (6).

6. See Revised Model State Administrative Procedure Act, § 1(2), Comment (1961).

7. Id.

8. Id.

9. See D.C.Code 1973, § 1–1509,

The basic difference between a quasi-judicial and a quasi-legislative hearing is as follows:

> A legislative hearing relates to "the making of a rule for the future." As distinguished from a judicial inquiry, it is a non-adversary proceeding which seeks to devise broad policy applicable to the public generally, or a substantial segment thereof, rather than to individual parties. In such hearings, "it is not necessary that the full panoply of judicial procedures be used." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960). While fact finding may to some extent be involved in the process, the due process requirements of confrontation and cross-examination, the hallmarks of the judicial inquiry, are not necessarily present. Rather the quasi-legislative inquiry tends to consult broad relevant data available from surveys, studies and published experience, free from the limitations of confrontation and cross-examination. Initially, the quasi-legislative inquiry depends on staff work. As here, the staff report often is presented to the interested public with the invitation to appear at a public hearing to oppose or praise. . . . [Hotel Association v. District of Columbia Minimum Wage and Industrial Safety Board, D.C.App., 318 A.2d 294, 306 (1974)(en banc), *quoting from* Jones v. District of Columbia, 116 U.S.App.D.C. 301, 303–304, 323 F.2d 306, 308–309 (1963) (footnote omitted).]

Central to our inquiry is the distinction between legislative and adjudicative facts. Professor Davis states that:

> Adjudicative facts are the facts about the parties and their activities, business-es, and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion. [1 K. Davis, Administrative Law § 7.02 at 413 (1958); Hotel Association v. District of Columbia Minimum Wage and Industrial Safety Board, *supra*, 318 A.2d at 306; Citizens Association of Georgetown, Inc. v. Washington, *supra*, 291 A.2d at 704.]

■ It is sometimes difficult to draw the line between legislative and adjudicative facts. This difficulty is compounded, in our view, by the phrase "after a hearing" in the definition of "contested case." Except in those rare instances where the organic act expressly requires a trial-type hearing for informal rulemaking,[10] *see* Automotive Parts & Accessories Association, Inc. v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330 (1968), informal rulemaking and adjudication are different processes requiring different procedures.[11] Consequently, not to make this distinction would make nonsense out of the "contested case" definition and was implicitly rejected by Hotel Association v. District of Columbia Minimum Wage and Industrial Safety Board, *supra*, 318 A.2d at 304–305. We therefore interpret the phrase "after a hearing" in the definition of "contested case" to mean after a trial-type hearing where such is implicitly required by either the organic act or constitutional right. Scarlett v. Town Council, 463 P.2d 26 (Wyo.1969); K. Davis, Administrative Law § 1.04–6 at 15 (1970 Supp.).

---

10. "Rulemaking" means the "Commissioner's, Council's, or agency process for the formulation, amendment, or repeal of a rule." D.C. Code 1973, § 1–1502(7). "Rule" means "the whole or any part of any Commissioner's, Council's, or agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of the Commissioner, Council, or of any agency." *Id.*, § 1–1502(6).

11. Rulemaking procedures are set forth under D.C.Code 1973, §§ 1–1505, 1–1507. Contested case procedures are set forth under D.C.Code 1973, § 1–1509.

Before applying these principles to the instant case, it is helpful briefly to review the legislative history of the SRA. For many years a special act of Congress was required in order to close any street or alley in the District. This procedure proved to be too cumbersome and was therefore remedied in 1932 with the passage of the SRA.[12]

Until 1967 the SRA empowered the Board of Commissioners to close a street. However, during that year President Johnson sent to Congress what was called Reorganization Plan No. 3 of 1967. The intent of the plan, among other things, was stated in the transmittal letter from the President as follows:

> The Council would be assigned the quasi-legislative functions now performed by the Board of Commissioners. The plan describes more than 430 functions which would be transferred to the Council. These include major responsibilities, such as the approval of boundaries and plans for urban renewal, establishment of rules governing the licensing of professions, and setting of rates for property taxation.[13]

The plan was approved by Congress without alteration. Section 402(168) of the plan specifically transferred to the Council the Board of Commissioners' function of closing any street, road, highway or alley under the SRA.[14]

We therefore have no doubt that Reorganization Plan No. 3 of 1967 transferred the street closing function to a quasi-legislative body. Yet, where a proceeding before a quasi-legislative body is concerned primarily with the "immediate rights, duties, or privileges of specific parties," instead of with general policy of future applicability, that proceeding falls within the "contested case" provisions of the DCAPA. Capitol Hill Restoration Society v. Zoning Commission, supra, 287 A.2d at 104–105. Thus, we must look beyond the label "quasi-legislative body" and determine whether the Council, in the proceeding here to close a street under the SRA, "performs an adjudicative function, weighing particular information and arriving at a decision directed at the rights of specific individuals, or sits in a legislative capacity, making a policy decision directed toward the general public." Citizens Association of Georgetown, Inc. v. Washington, supra, 291 A.2d at 704 (footnote omitted).

The SRA provides the Council with the authority to close any street or alley in the District which, in the judgment of the Council, has become useless or unnecessary, with the result that

> the title to the land embraced within the public space so closed [shall] revert to the owners of the abutting property subject to such compensation therefor in money, land, or structures as the District

---

12. The Senate report on the SRA states in part:

  **PURPOSE OF THE BILL**

  The need for this proposed legislation arises from the lack of any general statute empowering the Commissioners of the District of Columbia to close useless or unnecessary streets, roads, highways, or alleys.

  Each time the District Government acquires land for public purposes in any section where streets or alleys may have been laid out, a separate, special congressional enactment is required to permit the closing of the thoroughfares within the tract so acquired.

  At the present time a number of these individual street and alley closing bills are before Congress.

  \* \* \* \* \*

  Desirable changes in the highway plan of the District, which frequently involve the closing of parts of streets or alleys, likewise are delayed until specific authority for such closing is granted by an act of Congress. \* \* \*

  As a result of the present situation regarding the closing of such streets, the orderly improvement programs of the District Commissioners and the National Capital Park and Planning Commission have been subjected to costly delay and great inconvenience. [S.Rep.No.688, 72d Cong., 1st Sess. at 1–2 (1932).]

13. H.R.Doc.No.132, 90th Cong., 1st Sess. IV (1967).

14. See D.C.Code 1967, § 7–401, Transfer of Functions to Commissioner and Council.

of Columbia Council, in its judgment, may find just and equitable, in view of all the circumstances of the case affecting near-by property of abutters and/or nonabutters. . . . [D.C.Code 1967, § 7–401.]

The Council accordingly has the authority to make two determinations: (1) whether to close the street; and (2) if so, whether to ascertain damages and/or assess benefits resulting from the closing.

■ We hold that the Council in determining whether to close a street is exercising legislative discretion based upon primarily legislative facts; therefore, the proceeding on this question is not a "contested case" as defined by D.C.Code 1973, § 1–1502(8). We further hold that the Council's decision regarding compensation, though primarily adjudicatory, does not fall within the "contested case" definition because it is subject to a trial de novo in Superior Court.

We turn first to the question regarding possible benefits and damages resulting from the street closing. The Council in considering this issue, we think, is concerned primarily with "immediate legal rights, duties or privileges of specific parties," rather than questions of general policy. The valuation of a specific piece of property clearly involves adjudicative facts. The SRA, nevertheless, allows for de novo consideration of this issue in Superior Court. Section 7–405 provides for an in rem proceeding in Superior Court before a jury for "the ascertainment of damages and the assessment of benefits resulting from [a] closing and abandonment" where a timely objection to a street closing has been filed by a "party interested" under D.C.Code 1967, § 7–404. Only the question of possible damages and benefits is considered at the in rem proceeding.

"Such proceeding shall be conducted in like manner as proceedings for the condemnation of land for streets, under the provisions of sections 7–202 to 7–212, 7–214 and 7–215, and such closing and abandonment shall be effective when the damages and benefits shall have been so ascertained and the verdict confirmed." D.C.Code 1967, § 7–405. Whether the street should have been closed is not considered. Since the definition of "contested case" excludes "any matter subject to a subsequent trial of the law and the facts de novo in any court," D.C.Code 1973, § 1–1502(8), the Council's determination with regard to compensation is plainly not a "contested case."

■ We consider next the Council's decision concerning whether to close the street. Professor McQuillin states in his treatise on Municipal Corporations that "according to a well-established principle, said to be derived from the Roman Law, the title to streets and public ways, whether in the people or a municipality, or in fee or in easement, is held in trust for the public use. . . ."[15] As a consequence, the controlling factor in the vacation of a street by the Council must be the public interest and convenience rather than the interests of specific parties.[16]

Thus the Council, in deciding whether to close a street, considers and devises broad policy—that goes beyond the circumstances of specific parties—relating instead to the public generally. Policy decisions must be made with respect to such matters as traffic flow, transportation facilities, population density, and proper mixture of housing, commercial facilities, schools and parks. In making these policy decisions, the Council tends to consult broad relevant surveys, studies and published reports. Expertise from other government departments is sought.[17] Since at a public hear-

---

15. 10 McQuillin, Municipal Corporations § 30.36 at 696 (footnotes omitted).

16. It has been generally held in other jurisdictions that the public interest is the controlling factor in a street closing. *See* 11

McQuillin § 30.185 at 114–15, and cases cited therein.

17. In this case, the NCPC, the Department of Enviromental Services, and the Department of Highways and Traffic considered and commented on the proposed closing.

ing any interested person may offer his opinion regarding the proposed closing, the Council considers the opinion not only of the abutting property owners but also of the public generally. In short, the Council in deciding whether to close a street conducts a quasi-legislative hearing, sitting in a legislative capacity, making policy decisions directed toward the general public.

To impose "contested case" procedures such as cross-examination on such an inquiry would serve only to frustrate the Council's decision making. Because the decision to close the street permanently concerns the public generally and because the SRA permits any interested person to offer his views at the public hearing, there is the possibility of numerous persons. Given the problem of undue and repetitive cross-examination, the variance of counsel and pro se parties, the enhanced difficulties encountered with the wide range of issues involved in a "public interest" proceeding, the real possibility of redirect and recross and the interplay of different cross-examinations—the potential for havoc is not insignificant. More importantly, there is the real danger that the Council would be forced to focus on technical matters resulting in the obfuscation rather than clarification of the fundamental policy issues.

Other jurisdictions, interpreting similar "contested case" definitions, have held that proceedings analogous to the one here are not "contested cases." In re Roadway in Section 21, 357 S.W.2d 919 (Mo.1962) (proceeding to close roadway); Town of Ashwaubenon v. State Highway Commission, 17 Wis.2d 120, 115 N.W.2d 498 (1962) (proceeding to relocate state highway); Sherwin v. Mackie, 364 Mich. 188, 111 N.W.2d 56 (1961) (proceeding to prohibit parking on highway).

In conclusion, we hold that the proceeding before the Council to close 44th Street is not a "contested case" and accordingly dismiss the petitions for review for lack of jurisdiction.[18] D.C.Code 1973, § 1–1510.

Dismissed.

KERN, Associate Judge (concurring in the result):

I agree with the result reached by the majority but quite disagree with its construction of the contested case provisions of the District of Columbia Administrative Procedure Act (DCAPA).

Focusing on Section 1–1502(8) of D.C. Code 1973, which defines a contested case, and substituting for each term therein the definition for it contained elsewhere in Section 1502, a contested case may be defined thus:

A process [either] of rule-making, disposing finally of any matter, or licensing before the Commissioner, Council, or any agency in which the legal rights, duties, or privileges of specific persons entitled to be admitted as parties to such process are required by provision of any law (other than the DCAPA itself) or the Constitution to be determined after a hearing before the said Commissioner, Council or agency.

Nowhere in this definition of contested case enacted by Congress in 1968 is there *any* qualification of the phrase "after a hearing", which the majority concludes must be construed to mean "after a *trial-type* hearing" (emphasis added). Nor, with all deference, do I find, as the majority appears to find, that the Congressional definition of contested case, as set forth above, is "nonsense" unless so qualified.

---

18. We note that the Council's decision to close a street is not unreviewable. An action seeking equitable relief may be brought in the Superior Court. *Compare* Citizens Ass'n of Georgetown, Inc. v. Zoning Commission, 155 U.S.App.D.C. 233, 477 F.2d 402 (1973); Salyer v. McLaughlin, 100 U.S.App.D.C. 29, 240 F.2d 891 (1957).

The source of the majority's concern is that if an administrative law proceeding is a contested case within the meaning of the DCAPA then (1) the proponent of the proposed rule or order has the burden of proof, (2) every *party* thereto has the right to submit rebuttal evidence and conduct cross-examination, (3) the Commissioner, Council or agency, as the case may be, is required to maintain an official record, and (4) the decision rendered must be in writing accompanied by findings of fact and conclusions of law and is subject to judicial review in this court. D.C.Code 1973, §§ 1–1509, 1–1510. The majority seems to fear that this panoply of procedure will impair the workings of government if "contested case" is read as written.

An examination of the D.C.Code reveals that some 65 sections or subsections require a hearing before governmental action may be taken. This requirement exists in connection with three general categories of activity: (1) Grant, denial or revocation of licenses or applications; (2) Regulation of specific classifications of groups or persons, and (3) Governmental action affecting *both* identifiable specific persons and the remainder of the community. *See* Appendix. Only the last category appears to me to present any *potential* for practical difficulty if the provisions of a contested case dealing with cross-exami-

nation, maintaining a record, etc., are applicable. However, this *possible* difficulty is virtually eliminated by (1) the statutory right of the administrative body conducting a contested case to exclude irrelevant, immaterial and unduly repetitious evidence [1] and (2) the requirement in the definition of contested case that there *must* be *specific* persons entitled to be admitted as parties to the on-going administrative process affecting *their* legal rights, duties or privileges.

Given what I believe to be the clear and workable definition of contested case contained in Section 1502(8) which Congress only recently enacted after considerable study,[2] I would apply that statute as enacted rather than now rewrite the statute upon the basis of how *we* deem an administrative proceeding would best be conducted. *See* District of Columbia v. M.E.H., D.C. App., 312 A.2d 561, 567–570 (1973) (dissenting opinion).

In the instant case the Council proposed to close a street and Section 7–402 requires a hearing be held. The owners of the property abutting the street to be closed are in my view persons entitled to be admitted as parties to such administrative process since their legal rights and duties will certainly be affected by the Council's action.[3] Accordingly, I view the street-

---

1. The administrative entity before whom the contested case is held, whether it be the Commissioner, the Council or an agency, "*shall* exclude irrelevant, immaterial and unduly repetitious evidence." D.C.Code 1973, § 1–1509(b). (Emphasis added.)

2. The majority draws upon the Model State Administrative Procedure Act to support its construction of the DCAPA but it appears to me that our APA was deemed unique by its framers. Thus, the Committee report states: Obviously, all the provisions of the usual model State Administrative Procedure Act may not successfully be applied literally to the varied operations of the many different administrative agencies in the District of Columbia. Hence, the model act *has been revised in many respects to meet local conditions*, so the reported bill is well developed and provides a comprehensive District of

Columbia Administrative Procedure Act. (Emphasis added.) H.R.Rep.No.202, 90th Cong., 1st Sess. 4–5 (1967).

3. The procedural rights granted by the DCAPA in contested cases apply only to parties. D.C. Code 1973, § 1–1509. The SRA, on the other hand, provides that any "person interested" has a right to be heard, D.C.Code 1973, § 7–402, and to file written objections to the closing decision, forcing the Council to resort to a proceeding in rem to finalize its order. D.C.Code 1973, §§ 7–404, 7–405. It is clear that residents of the neighborhood surrounding the subject property are persons interested. It would follow, therefore, that representative advocates of their interests are entitled to be admitted as parties to the proceeding if those interests are not adequately represented by the abutting property owners.

closing here to be a contested case. However, Section 7–405 goes on to provide that if an objection to the street-closing is made "then the Commissioner . . . shall institute a proceeding in rem in Superior Court of the District of Columbia *for the closing of such street* . . . and for the ascertainment of damages and the assessment of benefits resulting from such closing. . . ." (Emphasis added.) The definition of contested case specifically *excludes* "any matter subject to a subsequent trial of the law and the facts de novo in any court". I am constrained to conclude that the Council's action here falls within that express exclusion, and therefore concur in the dismissal of the petitions for lack of jurisdiction.

### APPENDIX

1. *Licenses and Applications*

   D.C.Code §§ 2–129, 2–253(c), 2–433, 2–462, 2–517, 2–605, 2–606, 2–810, 2–920, 2–922, 2–1028, 2–1110, 2–1304, 2–1405, 2–1809(a) and (b), 2–2006(b) and 2–2409(f); §§ 3–214; 7–408, 25–115(b), 25–118; 26–602, 26–606; 29–417; 31–902; 35–222(b), 35–405, 35–426, 35–1306, 35–1339, 35–1340; 43–307, 43–416; 44–307, 44–416; 44–302(c); 45–1608; 47–2344(d) and (i), 47–2806.

2. *Regulations*

   D.C.Code §§ 1–252, 1–253, 1–257; 2–253(b), 2–914, 2–2110; 5–415, 5–705(a), 5–711, 5–718(a); 6–812(b); 7–115, 7–122; 36–407(a), 36–408(d), 36–434; 47–300.

3. *Action by Government*

   D.C.Code §§ 1–231 (controlling outdoor ad signs on public and private property), 1–244(f) (change names of highways); 5–706(c) (lease or sell property in a redevelopment area); 7–311 (close alley or street), 402 (close public way), 7–950(a) (rental of air space); 47–1106 (assessing property owner for public improvement).

HARRIS, Associate Judge, with whom REILLY, Chief Judge, and NEBEKER, Associate Judge, concur, dissenting:

This case has obliged the court to seek to reconcile two sets of statutes which are poorly mated. One is the Street Readjustment Act (SRA); the other is the District of Columbia Administrative Procedure Act (DCAPA). Centrally at issue is whether a hearing on a proposal to close a street, with the applicants' proposing to acquire title to the land on which the street is located, may reach the level of being a contested case under the DCAPA. If so, it would bring into play such basic rights as cross-examination and the opportunity for both the proponents and the opponents of the street closing to argue their positions before the members of the District of Columbia Council, which has the decisional responsibility.

The division of the court which originally heard the case decided unanimously that the street closing involved here was a contested case. Chevy Chase Citizens Association v. District of Columbia Council, D.C.App., 307 A.2d 740 (1973). That opinion was vacated by the order of the court by which we went en banc. Chevy Chase Citizens Association v. District of Columbia Council, D.C.App., 309 A.2d 97 (1973). Nonetheless, the original opinion remains a part of the reporter system, and it would be inefficient now to restate or paraphrase the analysis of the issues contained therein. We believe that the contested case question was resolved correctly in the division opinion, and we incorporate it herein by reference. Some specific comments, however, are called for by the majority opinion.

The result preferred by the majority in this case was preordained by the 5–4 decision of this court in Hotel Association of Washington, D. C. v. District of Columbia Minimum Wage and Industrial Safety Board, D.C.App., 318 A.2d 294 (1974). That case involved the minimum wage to be paid to employees in the hotel, restaurant, and allied occupations. It dealt with

the "legal rights, duties, or privileges of specific parties", and the Board was required to hold a hearing before determining the respective rights and duties of the affected employers and employees. D.C. Code 1973, §§ 1–1502(8), 36–407. Nonetheless, the majority of the court rejected the application of contested case concepts to that case, holding that those portions of the DCAPA were not applicable. 318 A.2d at 304–307. The apparent basis for that conclusion was the fact that the Act which created the Board did not itself prescribe contested case procedures. In light of that fact, it was concluded that the later-enacted DCAPA should be only partially applicable to Board proceedings.

The same type of rationale is apparent in the majority opinion in this case. Since the SRA, which was enacted in 1932, did not provide for a contested case type of proceeding (as recognized in the division's original opinion), the majority reasons that Congress could not have intended that a street closing might come within the contested case provisions of the DCAPA, which was enacted in 1968. We disagree.

As one charts the course of the majority opinion, one is struck by an extraordinary navigational feat. Just as the majority is about to run aground on the contested case shoal, the case is split into two parts, which then narrowly pass the shoal on opposite sides. That feat, however, readily is seen to be legally defective.

The basis for our characterization may be developed on a rather succinct step-by-step basis. Consider first the DCAPA's definition of a contested case. D.C.Code 1973, § 1–1502(8) provides that

the term "contested case" means a proceeding before the Commissioner, the Council, or any agency in which the legal rights, duties, or privileges of specific parties are required by any law . . . to be determined after a hearing before the Commissioner or the Council or before an agency, but shall not include (A) any matter subject to a

subsequent trial of the law and the facts de novo in any court; . . .

In our view, this case fits that definition rather precisely. The owners of the property on both sides of the subject block of 44th Street submitted a proposal that the street be closed, with title to that valuable land to revert to them for their use in the development of a commercial project. In effect, the ultimate question was to become whether the land involved is to be owned by the District of Columbia and used as a street, or whether it is to be owned by private parties, "subject to such compensation therefor in money, land, or structures as the District of Columbia Council, in its judgment, may find just and equitable. . . ." D.C.Code 1973, § 7–401. As we see it, issues such as title to land and compensation therefor inevitably necessitate determination of "the legal rights, duties, or privileges of specific parties". D.C. Code 1973, § 1–1502(8). Further, unquestionably a hearing was required on the proposal to close the street. D.C.Code 1973, § 7–402. The proper consequence of the presence of these factors, as we see it: a contested case.

The majority opinion, of course, concludes to the contrary. In so doing, it discusses both the Model State Act and the federal APA. However, the DCAPA is neither of those, nor is the District of Columbia a typical geopolitical entity. In the federal APA, the dichotomy is between the quasi-legislative and the quasi-adjudicatory. Nonetheless, even under that Act, when that which normally would be legislative (or rulemaking) in nature involves a private claim to a public resource, adjudicatory standards are to be imposed in the interest of fairness. *See, e. g.,* Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 33, 269 F.2d 221, 224 (1959).

Our reading of the DCAPA persuades us that its basic dichotomy is between the contested case and the noncontested case. Thus, while it establishes separate procedures for rulemaking (D.C.Code 1973, §§

1–1505 to 1507) and contested cases (D.C. Code 1973, § 1–1509), it specifically provides that in a contested case, "the proponent of a rule or order shall have the burden of proof." D.C.Code 1973, § 1–1509(b). That statutory provision can only be interpreted as recognizing that a proposed rule might have such "particular applicability" [see D.C.Code 1973, § 1–1502(6)] as to bring it within the purview of the contested case provisions.[1]

The sine qua non of the majority's conclusion that the 44th Street proceeding did not become a contested case is a restrictive interpretation of the word "hearing" in the DCAPA. Thus, the majority opinion states: "We therefore interpret the phrase 'after a hearing' in the definition of 'contested case' to mean after a trial-type hearing where such is implicitly required by either the organic act or constitutional right." (At 314.) Of course, if that had been the intent of Congress, it readily could have said so. It did not. To support its conclusion, the majority cites Scarlett v. Town Council, 463 P.2d 26 (Wyo. 1969). The Wyoming Code's definition of a contested case is similar to ours. See Wyo.Stat. § 9–276.19(b)(2) (1973 Cum. Supp.). However, the Scarlett case involved the expansion of a town's boundaries. The Supreme Court of Wyoming decided that the process of political annexation does "not resolve legal rights, duties, or privileges" in the sense of affecting vested property rights. 463 P.2d at 30. We would be inclined to share that view, but we consider it indisputable that the transfer of title to valuable land from the District of Columbia to private interests does involve the rights and privileges of specific parties—both those who would acquire the land and those who want the

street to remain available for transportation purposes.

Having concluded that Congress really meant "trial-type hearing" rather than "hearing" when it enacted § 1–1502(8), the majority goes on to take the step which was characterized *supra*. There is, of course, no question but that the Council is primarily a legislative body. The majority nonetheless recognizes that a proceeding before the Council may be a contested case, as long as it involves the immediate rights of specific parties. (At ——). To escape its dilemma, the majority merely slices the case in half. The Council's decision to close the street is labelled primarily legislative, and hence not subject to being a contested case. The Council's concomitant responsibility to determine what compensation should be paid to the city by the abutting owners who acquire the street (which is contained in the same sentence of § 7–401 of the Code) then is acknowledged by the majority to be primarily adjudicatory in nature. That would be expected to make the case fall within the contested case category. However, having bifurcated the case, the majority is in a position to move one. Since the so-called "reverse condemnation" aspects of a street closing do entitle an "interested party" to an in rem proceeding in the Superior Court if it is dissatisfied with the Council's compensation decision, see D.C.Code 1973, § 7–405 and Chevy Chase Citizens Association v. District of Columbia Council, *supra*, 307 A.2d at 749–751, the majority concludes that the latter type of proceeding would constitute "a subsequent trial of the law and the facts de novo" as described in § 1–1502(8) so as to defeat a contested case determination.

Such reasoning is manifestly faulty. The majority does not cite—nor, in our

---

1. No one has taken the position that a street closing is rulemaking. The majority opinion stresses the concept that "rulemaking and adjudication are different processes requiring different procedures." (At 314.) If the majority perceives that to be the basic dichotomy in the DCAPA, and assuming

this case not to involve rulemaking, it is difficult to understand how the majority can treat the question of title to the land involved as not being adjudicatory in nature —particularly since they concede that the question of the compensation for the land is adjudicatory.

view, could it—any authority for the proposition that the term "de novo" may have applicability to only half of a proceeding. For a matter truly to be tried de novo, the entire proceeding must be newly at issue, not just part of it. As stated in Pittsburgh Steamship Co. v. Brown, 171 F.2d 175, 178 (7th Cir. 1948):

> [P]laintiff was entitled to a trial de novo . . . and such a trial contemplates what the term implies, a trial anew of the entire controversy, including the hearing of evidence, as though no previous action had been taken.

The device of bifurcation is, of course, indispensable to the majority's result. If the street closing proceeding as an entity truly were subject to trial de novo in Superior Court, the decisions to be reached by the court necessarily would include whether the street should be closed. If that question thus became one for judicial determination, it scarcely could be considered legislative.[2] Since the majority is unable to declare a street closing proceeding definitively to be either legislative or adjudicatory in nature, it declares it to be both, and puts each half in a different compartment. Such an approach is inconsistent with what we consider to be the basic dichotomy of the DCAPA, which is, that a matter either is a contested case or it is not.

It should be stated that the minority has no basis for quarreling with the wisdom of the Council's decision to close 44th Street. Our concern is with the procedural aspects of the case. It appears that the reaction of the majority was motivated to a significant degree by a fear that permitting opponents of a street closing to conduct cross-examination of a proponent's witnesses might result in an unmanageable proceeding.[3] (At 316–317). We do not share that concern. It is our view that in cases such

as this, elementary principles of fairness and the public interest are furthered by an appropriate development of both sides of an issue, through both cross-examination and argument before the decision-makers.

We noted at the outset that the SRA and the DCAPA mesh poorly. This circumstance exists to varying degrees with respect to each of the many Acts which have created various agencies for the District of Columbia. As would be expected, Congress recognized this fact when it enacted the DCAPA. The first section of that Act accordingly provides (D.C.Code 1973, § 1–1501):

> This chapter shall supplement all other provisions of law establishing procedures to be observed by the Commissioner, the Council, and agencies of the District government in the application of laws administered by them, except that this chapter shall supersede any such law and procedure to the extent of any conflict therewith.

That statute was considered by this court in Wallace v. District Unemployment Compensation Board, D.C.App., 289 A.2d 885 (1972). The unanimous opinion in that case was written by the author of the majority opinion in this case. With reference to § 1–1501, the court then stated (at 887):

> This language is clear, unambiguous and unequivocal. Any procedures of the Board which do not comply with the APA are superseded.

We consider the fact that the Street Readjustment Act of 1932 did not provide for a contested case type of proceeding to be legally irrelevant in light of the provisions of the DCAPA, which was enacted 36 years later. A hearing was required in this case, and it did determine "the legal rights, duties, or privileges of specific par-

---

**2.** The reverse condemnation statute itself makes it clear that only "damages and benefits" are to be determined in such a proceeding. D.C.Code 1973, § 7–405.

**3.** The same type of thinking also appears to have influenced the majority in Hotel Ass'n of Washington, D. C. v. District of Columbia Min. Wage & Indus. Safety Bd., *supra.*

ties". D.C.Code 1973, § 1–1502(8). By definition, as we see it, that made the proceeding a contested case, which should have brought into play the full procedural guarantees of § 1–1509.

In concluding, one fact should be stressed. The final word of the majority opinion is *"Dismissed."* The Council's action is not affirmed by the majority on its merits; it is declared unreviewable. We consider such a result to be inconsistent with the basic philosophies of both the DCAPA and that section of the District of Columbia Court Reorganization Act of 1970 which restated the jurisdiction of this court to review actions of a number of agencies, specifically including the District of Columbia Council.[4] D.C.Code 1973, § 11–722. In effect, the majority is saying that it does not want to carry this particular ball, and is handing it back to Congress. The problem, erroneously in our opinion, thus now rests again with the legislature. We respectfully dissent.

4. The majority obviously has misgivings as to insulating this type of Council action from normal judicial review, noting that "equitable relief" from a street closing may be sought in the Superior Court. (At 317, n. 18.) We are at a loss to understand the rationale for denying direct review under the DCAPA while encouraging the seeking of some undefined remedy in the trial court. Presumably any action taken by the trial court would be reviewable here, so perhaps the principal effect of the majority opinion will be to interject another layer of judicial proceedings.