Johannes V. HOEBER et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA REDEVEL-
OPMENT LAND AGENCY et
al., Defendants.

L'ENFANT PLAZA PROPERTIES,
INC., et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA REDEVEL-
OPMENT LAND AGENCY et
al., Defendants.

Civ. A. Nos. 74–733, 74–959.

United States District Court,
District of Columbia.

April 30, 1976.

Arthur H. Berndtson, Washington, D. C., for plaintiffs in Civ. A. No. 74–733.

Kenneth Wells Parkinson, Daggett H. Howard, Henry Roemer McPhee, Washington, D. C., for plaintiffs in Civ. A. No. 74–959.

C. William Tayler, Richard L. Sippel, Washington, D. C., for intervenor-plaintiff Harbor Square Owners, Inc.

C. Francis Murphy, Corp. Counsel, John A. Earnest, Thomas R. Nedrich, Asst. Corp. Counsels, Washington, D. C., for District defendants.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Nathan Dodell, Asst. U. S. Attys., Washington, D. C., for defendants NCPC and RLA.

## MEMORANDUM

WILLIAM B. JONES, Chief Judge.

### INTRODUCTION

In these consolidated cases, a group of corporate and private plaintiffs challenge two attempted modifications of a redevelopment plan. The overall plan originally was developed and approved by defendants for Southwest Washington, D. C., pursuant to the District of Columbia Redevelopment Act of 1945, 5 D.C.Code § 701 et seq. The two modifications concern (1) "Parcel 76," which under the plan was designated originally for rowhouses, flats and/or two or three story apartments, was amended in 1963 to provide for semi-public or church use, and now is being modified to permit low and moderate income housing; and (2) Sites D–1 and D–2, which originally were designated to permit 50–60 transient units, were later redesignated with plaintiffs' consent to permit 100 transient units, and which are now being modified to permit 150 transient units.

Plaintiffs in Civil Action 74–733 [hereinafter Hoeber plaintiffs] are several owners of townhouses in the Southwest Area near Parcel 76. They challenge only the proposed modification of the plan as it pertains to Parcel 76. Plaintiffs in Civil Action 74–959 [hereinafter L'Enfant plaintiffs] own or lease property within a few blocks of Parcel 76 and Sites D–1 and D–2. They challenge modification of the plan as it pertains to Parcel 76 and Sites D–1 and D–2. Intervening as a party plaintiff in both actions is Harbor Square Owners, Inc., a nonprofit cooperative housing corporation which owns certain real property in the Southwest Area. The L'Enfant and Hoeber plaintiffs seek declaratory and injunctive relief to prevent the attempted modifications of Parcel 76 and Sites D–1 and D–2 without their written consent as they contend D.C. Code § 5–711 requires. The intervenor plaintiff seeks only declaratory relief concerning the meaning of D.C.Code § 5–711.

Defendants are the National Capital Planning Commission [NCPC], the District of Columbia Redevelopment Land Agency [RLA], and the District City Council and Council members [District defendants]. Any modification of a project area redevelopment plan is first proposed by RLA, then approved by NCPC, and finally submitted to the District City Council for final approval or rejection after notice and a public

hearing. See D.C.Code § 5–711. The District City Council has approved the modifications for Parcel 76 and Sites D–1 and D–2.

Plaintiffs challenge the modifications on statutory grounds. They argue first that D.C.Code § 5–711 permits modification of the plan only if all purchasers or lessees within a "project area"[1] who may be affected by the modification consent in writing to such modification. Plaintiffs' consent has not been obtained. Defendants contend that such written consent is required only from the purchaser or lessee of the property, the use of which is being modified. Since Parcel 76 is owned by RLA, which initially proposed modification of its use, no consent would be required. The redeveloper of Sites D–1 and D–2, not a party to this suit, initiated the modification procedures for those sites by request to the RLA. Thus, the only bar to modification is plaintiffs' lawsuits. Second, plaintiffs contend that the procedures resulting in City Council approval of the two modifications were procedurally defective. Finally, they argue that defendants are estopped from asserting that plaintiffs' consent is not required, in light of past representations made to them by defendants.[2]

Presently before the Court are defendants' Motions to Dismiss or in the Alternative for Summary Judgment.[3] The parties have extensively briefed the issues and the Court has had the benefit of oral argument. The motions are ripe for decision.

## MEANING OF SECTION 5–711

The major controversy hinges upon an interpretation of D.C.Code § 5–711, which provides in pertinent part:

An approved project area redevelopment plan may be modified at any time or times; *Provided,* that any such modification as it may affect an area or part thereof which has been sold or leased shall not become effective without the consent in writing of the purchaser or lessee thereof. . . .

The ambiguity is apparent from the face of the statute as defendants concede. It is unclear whether the term "purchaser or lessee thereof" refers to the purchasers and lessees of the area whose use is to be modified, or to the purchasers and lessees of property in the general vicinity who "may be affected" by the modification.

The legislative history of this section is inconclusive as to its meaning. In their principal argument on congressional intent, plaintiffs note that one of the two proposed bills from which section 5–711 emerged, S. 13, included "directly" as a modifier of "affect." Non-inclusion of this word in the final bill, according to plaintiffs, constitutes its rejection and commands a broader interpretation of "affect." No legislative debates or reports either support or undercut plaintiffs' contention that the Congress specifically rejected the narrower interpretation advanced here by defendants. The only legislative history uncovered by the parties or by the Court is a short speech by General Ulysses S. Grant, III, then chairman of the National Capital Park and Planning Commission. *See* Hearings Before Sub-Comm. of the Comm. on the District of Columbia, 79th Cong., 1st Sess. 172 (1945). In his remarks, General Grant explained that under S. 610, which did not contain the modifier "directly" or "may be affected by," the consent of the purchaser or lessee of the property whose use was to be modi-

---

1. The plan divides Southwest Washington into certain "project areas." The site of the proposed modifications at issue here, and the site of all plaintiffs' properties, is Project Area C.

2. Defendants initially argued that only the Superior Court for the District of Columbia had jurisdiction over this dispute. At the hearing on defendants' motions to dismiss or for summary judgment, counsel for defendants represented to the Court they had abandoned the jurisdictional argument.

3. The parties have stipulated to facts not in issue and refer to these facts in their briefs. Because the motions include facts outside the pleadings, defendants' motions will be treated as summary judgment motions. *See* Rule 12(b), F.R.C.P.

fied would be required. No questioning, criticism, or debate concerning the explanation ensued. Indeed, the thrust of General Grant's remarks addressed the inflexibility of permitting modification only of undeveloped land, not the need or desirability of obtaining consent for modification. At least at that point in the legislative process, no one seemed to question the premise that only the purchaser or lessee of the property whose use was to be modified need consent to the modification. Why the word "directly" was omitted is simply unknown.

■ With such scant and inconclusive legislative history, the Court must of necessity examine the reasonableness of each party's interpretation. Critical to this inquiry, of course, is the constitutional implication of each interpretation, and if one would render the statute unconstitutional and thereby ineffective, its adoption should be avoided. *See United States v. Blasius,* 397 F.2d 203, 207 n. 9 (2d Cir. 1968). Because plaintiffs' broader interpretation must necessarily render Section 5–711 unconstitutional, it must be rejected.

In a series of three cases between 1912 and 1928, the Supreme Court set out certain guidelines for determining the constitutionality *vel non* of "consent provisions" similar to Section 5–711. In *Eubank v. Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), the Court struck down a municipal ordinance which provided:

> that whenever the owners of two thirds of the property abutting on any street shall, in writing, request the committee on streets to establish a building line on the side of the square on which their property fronts, the said committee shall establish such line so that the same shall not be less than 5 [five] feet nor more than 30 [thirty] feet from the street line.

Once the line was established, no building could be built in front of the line.

The Court held that the ordinance unconstitutionally delegated the police power to private individuals, since it did not serve the public safety or welfare of the community:

> In other words, part of the property owners fronting on the block determine the extent of use that other owners shall make of their property. In what way is the public safety, convenience or welfare served by conferring such power? The statute . . . creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest or even capriciously.

226 U.S. at 143–44, 33 S.Ct. at 77, 57 L.Ed. at 159.

*Eubank* was distinguished by the Court in *Cusack Co. v. Chicago,* 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917), where plaintiff challenged an ordinance prohibiting erection of billboards in residential areas unless a majority of the property owners in the affected block consent to the billboard's erection. The Court first noted that evidence of the deleterious effect of billboards was ample to justify their prohibition. Permitting persons affected by the billboards to waive their prohibition in the Court's view was not an unconstitutional delegation of the police power. *Eubank,* the Court reasoned, did not control as the ordinance struck down there permitted two-thirds of the landowners to initiate and impose a restriction on the others. The street committee was a "mere automatic register" of the landowners' action. In *Cusack,* the municipality originally had imposed a valid restriction against a deleterious land use, which could be waived by a majority of the landowners, who were protected by the restriction. 242 U.S. at 531, 37 S.Ct. at 192, 61 L.Ed. at 476. *See also Nortown Theatre, Inc. v. Gribbs,* 373 F.Supp. 363, 368–69 (E.D. Mich.1974).

If *Cusack* could be considered a liberalization of the standards enunciated in *Eubank,* the final case in the trilogy undercuts such speculation. In *Seattle Trust Co. v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928). Seattle had enacted "a comprehensive zoning ordinance" in 1923, dividing the city into six use districts and outlining the uses permitted in each district. In

plaintiff's district, the ordinance permitted construction of "a philanthropic home for children or for old people," but only if "the written consent shall have been obtained of the owners of two-thirds of the property within four hundred (400) feet of the proposed building." Imposition of this burden on a landowner seeking to construct a philanthropic home was, according to the Court, repugnant to the due process clause of the Fourteenth Amendment. The Court reasoned:

> The section purports to give the owners of less than one-half the land within 400 feet of the proposed building authority— uncontrolled by any standard or rule prescribed by legislative action—to prevent the trustee from using its land for the proposed home. The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice.

278 U.S. at 121–22, 49 S.Ct. at 52, 73 L.Ed. at 213.

*Cusack* was inapposite, the Court stated, because the legislature there had determined, with sufficient supportive evidence, that billboards were deleterious to the public safety and decency. In *Roberge*, no such determination had been made; indeed, the inclusion of a philanthropic home as a possible usage of land in plaintiff's district demonstrated that the legislature considered it harmonious with the public interest. *Id.*

Plaintiffs attempt to distinguish *Roberge* as involving an invalid zoning restriction, which the city attempted to cure by permitting the surrounding landowners to consent to lifting the restriction. There is nothing in *Roberge* which suggests that the Court determined prohibition of philanthropic homes to be an invalid zoning restriction. Indeed, the Court stated at the end of its opinion:

> We need not decide whether, consistently with the Fourteenth Amendment, it is

within the power of the State or municipality by a general zoning law to exclude the proposed new home from a district defined as is the first district in the ordinance under consideration.

278 U.S. at 123, 49 S.Ct. at 52, 73 L.Ed. at 214. The basis of the Court's opinion was not the legislature's failure to exercise its judgment at all, which would have rendered the consent provision illegal under *Eubank*, nor was it the legislature's improper exercise of its judgment. Rather, the Court struck down the ordinance because it provided to the surrounding landowners the absolute, unconfined power to prohibit one landowner from using his land in a manner not repugnant to the public welfare. *See Village of Belle Terre v. Boraas*, 416 U.S. 1, 6–7, 94 S.Ct. 1536, 1539–1540, 39 L.Ed.2d 797, 802–803 (1974). If anything, the situation which would be presented here if plaintiffs' interpretation of section 5–711 were accepted would be even more egregious, since the non-consent of *one* landowner, not that of one-third of the landowners, unchecked by identifiable standards for exercise of such a veto power, precludes another from using his land in a way *expressly deemed* by the NCPC, the RLA and the City Council after public hearings to be consonant with the public welfare. As the court stated in *Eubank*, "In what way is the public safety, convenience or welfare served by conferring such power?" 226 U.S. at 143, 33 S.Ct. at 77, 57 L.Ed. at 159.

Plaintiffs would have the Court bring this case within the *Cusack* exception, where the legislature had made express findings concerning the deleterious effects of billboards. Noting that here express findings have been made regarding the benefits of the original redevelopment plan, plaintiffs argue that *Cusack* permits modifications to be rejected by affected persons. This argument, however, is based upon the converse of the situation in *Cusack*, and further misses the crucial distinction between the two legislative actions. In *Cusack*, the legislature expressly prohibited a particular land use because of its deleterious effects; here, no express prohibition of

a deleterious use has been made. In *Cusack*, it was the *legislature* which originally restricted a person's use of his land; here, plaintiffs would permit *any private "affected" person* in the area, without identifiable standards, to restrict a person's use of his land. The former is valid legislative action; the latter is an unconstitutional delegation of power.

Finally, plaintiffs contend that their interpretation of the modification procedure does in fact serve the public interest by providing affected property holders with a measure of certainty necessary to induce investment in urban renewal areas. Even assuming this to be true, a questionable assumption on the record presented,[4] there is nothing in *Roberge* to argue that such an assumption would be controlling. Indeed, the ordinance challenged there was part of a "comprehensive zoning ordinance" enacted in 1923, similar to the Redevelopment Act in the instant case enacted in 1945. In both cases purchasers and lessees would invest at least in partial reliance on the nature of the usage of the surrounding neighborhood which the zoning ordinance or redevelopment act mandated. In both instances, however, the laws contemplated modification of the proposed plan, and in *Roberge* the Court found that such modifications could not be vetoed by the unchecked power of a small minority of affected landowners. If plaintiffs' interpretation of section 5–711 can indirectly be deemed related to the public interest, it must yield to the dictates of the due process clause.

■ Even on a practical level, plaintiffs' interpretation must be rejected. A statute should be given a reasonable and sensible construction so as not to render it unworkable or ineffective. *Wilderness Society v. Morton*, 156 U.S.App.D.C. 121, 479 F.2d 842, 855 (1973), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1974). Plaintiffs would require that any person who may be substantially and adversely affected by a proposed modification be given the power to veto that modification by refusing his consent. As counsel for plaintiffs recognized at the hearing on the pending motions, every time a modification is proposed, defendants would be required to contact all "lessees or purchasers" in the project area (estimated by the parties at oral argument to be, at a minimum, four hundred) to determine what if any effect the modification would have on them. If questions arose as to who was "substantially and adversely affected," the Court would necessarily decide each case based upon criteria that are nebulous at best. Considerations of aesthetics, air pollution, noise pollution, congestion, economics, sociology, and countless other factors would enter into the decision. While it is, of course, the office of the judiciary to decide such interpretive questions, the foreseeable lengthy individual litigations would completely halt defendants in any attempted modification. Congress has provided in section 5–711 for citizen input in the modification process, so that all views are heard and considered by the various agencies. Such a procedure is a workable and fair one, whereas plaintiffs' procedure would virtually halt a process of modification Congress deemed to be necessary and designed to be flexible. For this reason, as well as the reasons of constitutional stature outlined before, this Court is compelled to reject plaintiffs' interpretation of D.C.Code § 5–711.

## PROCEDURAL REQUIREMENTS

■ Both the L'Enfant and the Hoeber plaintiffs challenge the City Council approval of the modifications as procedurally irregular. They ask the Court to rule the City Council approval without legal effect because it did not comply with the dictates of the District of Columbia APA, D.C.Code § 1–1501 *et seq.* According to plaintiffs, the proceeding was a "contested case,"

---

4. Plaintiffs note that recently developers have invested in Project Area C, even though the lease or sale agreements expressly provide that the lessee or purchaser has no control over modifications of land other than his. Pl's Mem. at 11–12.

which under the DCAPA can be decided only after certain procedural safeguards have been met. *See* D.C.Code § 1–1509. Defendants contend that the City Council decision is not a "contested case" to which the DCAPA would apply, and even if it were, direct review lies in the District of Columbia Court of Appeals, not here. The latter question need not be reached since it is clear that the City Council proceeding is not a "contested case" within the meaning of the APA.

The DCAPA defines "contested case" as follows:

> [A] proceeding before the Commissioner, the Council, or any agency in which the legal rights, duties, or privileges of specific parties are required by any law (other than this chapter), or by constitutional right, to be determined after a hearing before the Commissioner or the Council or before an agency   .   .   .

D.C.Code § 1–1502(8). If the statute grants a hearing—as the D.C. Redevelopment Act does here (see section 5–711)—that does not automatically confer "contested case" status on the proceeding. Rather the crucial issue is "whether or not the hearing required by [the act] is adjudicative or legislative in nature." *Dupont Circle Citizens' Ass'n v. D.C. Zoning Comm'n*, 343 A.2d 296, 299 (D.C.Ct.App.1975).

The District of Columbia Court of Appeals has provided considerable guidance since 1972 regarding this issue. In *Capitol Hill Restoration Soc. v. Zoning Comm'n*, 287 A.2d 101 (D.C.Ct.App.1972), plaintiffs had requested the Zoning Commission to approve a "planned unit development" for a particular parcel of land which they owned. The Zoning Regulations permit the Commission to approve such a plan even if it would conflict with existent zoning regulations. See Article 75, Zoning Regulations of the District of Columbia (1973 reprint). The court held that plaintiffs' application constituted a "contested case" within the meaning of the DCAPA, since it was primarily adjudicatory in nature, requiring the Commission to "resolve disputed fact ques-

tions of specific applicability," such as the relationship of the plan to the policies of the District of Columbia and the quality of neighborhood enhancement resulting from implementation of the plan. 287 A.2d at 105.

*Capitol Hill Restoration Society*, on which plaintiffs primarily rely, has been limited to its facts by subsequent cases. In *Citizens Ass'n of Georgetown, Inc. v. Washington*, 291 A.2d 699 (D.C.Ct.App.1972), the court held that an application for an amendment to the zoning regulations concerning the Georgetown Waterfront Area was not a "contested case." The court observed that the Commission's "evaluation of the area would not rest upon the status of any particular property, nor would the peculiar problems of any one individual in the area be of paramount concern." 291 A.2d at 705. Instead, the Commission would of necessity make "[p]olicy decisions regarding the proper mixture, location and size of housing and commercial facilities   .   .   .   and the opinions of a wide cross section of interested citizens may well be considered." *Id.* The proceeding, in short, lacked the "specificity of subject matter and result, indicative of an adjudicatory proceeding," to mandate labeling it a "contested case." *Id.* In *Chevy Chase Citizens Ass'n v. District of Columbia Council*, 327 A.2d 310 (D.C.Ct.App.1974) (en banc), the court held that an application to the City Council for a street closing by landowners abutting the street was not a "contested case." The court first observed that "the controlling factor in the vacation of a street by the council must be the public interest and convenience rather than the interests of the specific parties." 327 A.2d at 316.

> Policy decisions must be made with respect to such matters as traffic flow, transportation facilities, population density, and proper mixture of housing, commercial facilities, schools and parks. In making these policy decisions, the Council tends to consult broad relevant surveys, studies and published reports. Expertise from other government departments is sought.

*Id.* Thus, even though the Street Readjustment Act provided that the title of the street property, if closed by the City Council, would repose in the landowners abutting the street, whether the street should be closed was not a "contested case." Finally, in *Miller Development Co. v. District of Columbia Zoning Comm'n,* 340 A.2d 420 (D.C.Ct.App.1975) (en banc), the court held that an application for a zoning amendment regarding a *specific parcel of land* was not a "contested case." In words clearly controlling of the instant case, the court stated:

> Once a single parcel of land is rezoned it necessarily affects the surrounding area since a use previously prohibited in an area is now allowed. It also invites other property owners in the area to apply for similar amendments. Thus the decision, while affecting the individual landowner who proposes the amendment, is basically one of policy which takes into consideration the needs of the area as a whole. The authority to determine these needs is delegated to the Zoning Commission. When it exercises that authority by denying a proposed amendment without a public hearing it is acting legislatively and is not subject to contested case status and review of this court.

340 A.2d at 424.

In the instant case, in determining whether a modification should be permitted, the City Council necessarily must consider its effect on the urban renewal plan as a whole, as well as the area most directly affected. A broad ranging inquiry into housing mixture, transportation, commercial and support facilities, ecological factors, and numerous other considerations must take place. Such a proceeding is quasi-legislative at a minimum, and clearly not a "contested case" within the meaning of the DCAPA. The procedural requirements applicable to a contested case are inapposite here.

Alternatively, plaintiffs argue that insufficient notice of the Council hearing was given. Section 5–711 of the Redevelopment Act provides that "Before approval [of a modification], the District Council shall hold a public hearing on the proposed modification after ten days' public notice." The public hearing was held April 5, 1974. Notice of the meeting was published in The Washington Star-News on March 25 and April 1, 1974, eleven and four days before the hearing. Notice of the hearing was published in the D.C. Register on March 29, 1974, seven days before the hearing. There is nothing in section 5–711 requiring that notice be published in the D.C. Register. At oral argument, counsel for plaintiffs could not direct the Court to, and the Court has been unable to find on its own, any statute requiring the notice to be published in the D.C. Register. Since publication in The Washington Star-News was at least ten days before the April 5 hearing, the procedural requirements of section 5–711 have been met.

## ESTOPPEL

Plaintiffs' final argument would require defendants to adopt plaintiffs' interpretation of section 5–711 because of defendants' prior actions and statements tending to agree with plaintiff's interpretation. Besides certain letters from defendants already in the record, which they contend demonstrate defendants' agreement with plaintiffs' interpretation, they offer to prove that defendants made oral representations to plaintiffs that no modification would be adopted without their consent, that plaintiffs relied on those representations and letters to their detriment, and that defendants should now be estopped from asserting an interpretation different from their earlier representations.

While it is clear that estoppel can act against the government in egregious cases of injustice, *C. F. Lytle Co. v. Clark,* 491 F.2d 834, 838 (10th Cir. 1974), to apply it in this case would result in permitting section 5–711 to operate in an unconstitutional manner. It was for this reason that plaintiffs' interpretation was rejected, and they cannot now argue that the same un-

constitutional result should be allowed via the doctrine of equitable estoppel.

An appropriate order is being entered simultaneously with this Memorandum.

### ORDER

Upon consideration of defendants' motions to dismiss, or in the alternative for summary judgment, the memoranda submitted in support thereof and in opposition thereto, and for the reasons stated in the Court's Memorandum filed in this matter today, it is this 29th day of April, 1976,

ORDERED that defendants' motions be and the same hereby are granted, and it is further

ORDERED that plaintiffs' and intervening plaintiff's actions be and the same hereby are dismissed.